**MANUFACTURERS HANOVER OVER-SEAS CAPITAL CORPORATION, Plaintiff,**

v.

**SOUTHWIRE COMPANY, Defendant.**

**No. 84 Civ. 7863.**

United States District Court, S.D. New York.

May 18, 1984.

Simpson Thacher & Bartlett (a partnership which includes professional corporations), New York City, for plaintiff; Melvyn L. Cantor, Michael J. Chepiga, Joseph F. Tringali, New York City, of counsel.

Debevoise & Plimpton, New York City, Kilpatrick & Cody, Atlanta, Ga., for defendant; John G. Koeltl, Jonathan H. Hines, New York City, Susan A. Cahoon, Atlanta, Ga., of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Manufacturers Hanover Overseas Capital Corporation ("MHOCC") has moved for partial summary judgment pursuant to F.R.Civ.P. 56; for an order pursuant to F.R.Civ.P. 54(b) directing that judgment be entered in its favor on the claim at issue; and for an order pursuant to F.R.Civ.P. 15(a) granting leave to serve an amended complaint. The underlying action was brought by MHOCC against Southwire Company ("Southwire") to recover money on a written guaranty executed by Southwire in MHOCC's favor.[1] The guaranty was issued in connection with a $25,000,000 loan made in 1979 by MHOCC to Suramericana de Aleaciones Laminada, C.A. ("Sural"), a Venezuelan company of which Southwire owns 49 percent.

The motion for partial summary judgment is granted since the court cannot agree with Southwire that its obligations under the guaranty have been suspended by any agreement between Sural and MHOCC. MHOCC's request for entry of a judgment pursuant to F.R.Civ.P. 54(b) is, however, denied. MHOCC has not set forth facts to convince the court that there is "no just reason for delay." The motion for leave to serve an amended complaint, unopposed by Southwire, is granted.

*Background*

1. *The loan agreement* [2]

Pursuant to an agreement dated October 31, 1979, ("the loan arrangement"), MHOCC loaned Sural $25,000,000 U.S. dollars for the purchase of machinery and equipment, the purchase of land and the construction of a plant in Venezuela for the production of aluminum rod, cable and other products. Sural executed in favor of MHOCC a promissory note in the principal sum and in connection with the signing of the loan arrangement, Southwire guaranteed 49 percent of that note. Both the loan arrangement and the note contained provisions that all payments made thereunder would be in U.S. dollars at the offices of Manufacturers Hanover Trust Co. in New York, New York. Interest payments were

---

1. MHOCC's complaint was filed on October 27, 1983. Later that same day, Southwire filed a similar complaint in the Northern District of Georgia, Atlanta Division, seeking declaratory judgment on, after amendment of its complaint, three security instruments signed in connection with a loan, as explained above. MHOCC moved to dismiss or stay the Georgia action, or in the alternative, to transfer venue to this district under 28 U.S.C. § 1404(a). Its motion to transfer venue was granted. That case, *Southwire Co. v. Manufacturers Hanover Overseas Capital Corp.*, 84 Civ. 929 (RLC), is now pending here and the court affords counsel until June 7 to submit, if they desire, reasons to the court why the two cases should not be consolidated for all purposes.

2. Facts below are taken mainly from the affidavits of Jerome B. Flax, Senior Vice President and Secretary of MHOCC, and Alfredo Riviere Villamizar, President of Sural.

to begin on December 31, 1979, and the principal was to mature in 25 consecutive quarterly installments, payable on the 4th through the 28th payment dates. (Exhibit A, Flax Affidavit).

Although Sural's loan payments had not in any case been proceeding smoothly,[3] in February, 1983, the Venezuelan government froze temporarily all exchanges of bolivares for U.S. dollars. Thereafter, the government announced a procedure by which companies could apply for approval for payment of pre-existing debts in U.S. dollars at the official exchange rate of 4.3 bolivares to the dollar, a rate apparently a great deal more favorable than the one available elsewhere during that period.[4] In March, 1983, representatives of Sural and MHOCC met to discuss whether Sural should apply to participate in this program.

The content of the agreement reached by Sural and MHOCC is the subject of contention in this suit. In consequence of some understanding reached, however, Sural began depositing bolivares into bank accounts in Venezuela for the benefit of MHOCC in quantities sufficient at the 4.3 rate to bring Sural current on the note by the end of 1983. MHOCC contends that these deposits were made as "collateral security for the payment of interest and principal." (Exhibit F, Flax Affidavit). It denies that these deposits can in any way be considered partial payment of the U.S. dollar debt to MHOCC. Southwire maintains, on the other hand, the partial payment position; at the least, it argues, the deposits functioned to defer the time at which Sural's, and hence Southwire's obligation to make payments on the note in U.S. dollars came due.

The guaranty executed by Southwire in MHOCC's favor binds Southwire to

unconditionally and irrevocably guarantee[s] to MHOCC ... the prompt and complete payment when due (whether at the stated maturity, by acceleration or otherwise) of (i) 40% of the unpaid principal amount of the Note; (ii) 49% of the amount of accrued and unpaid interest on the Note; and (iii) 49% of any and all other unpaid indebtedness, obligations and liabilities of [Sural] to MHOCC now existing or hereafter incurred under or arising out of or in connection with the Loan Agreement, the Note or any Security document, whether for principal, interest, fees, expenses or otherwise....

(Exhibit C, Flax Affidavit, ¶ 4).[5] Southwire emphasizes that the guaranty is actionable only when Sural has left unpaid a payment due. Because, pointing to the MHOCC/Sural agreement, Southwire maintains that the requisite default has not occurred, it argues that it cannot be held liable yet under the guaranty.[6] The merits of this claim aside, Southwire contends that the question of fact concerning the meaning of the agreement precludes the award of summary judgment.

### 2. The MHOCC suit

MHOCC's complaint in this action states three claims. The first seeks 100 percent of the past due principal and interest amounts under an instrument known as the "offtake contract", under which Southwire allegedly promised to pay, as each quarterly installment came due, any and all amounts which Sural itself could not pay to MHOCC. The second, on which MHOCC has brought this motion for summary judgment, seeks to impose liability on South-

---

**3.** It is not clear how many installment payments Sural made. In 1981 it began having problems keeping up with the payment schedule due to difficulties which developed between Sural and its aluminum supplier and due to problems with the exchange rate of bolivares for dollars.

**4.** See Riviere Affidavit, ¶ 5, stating his understanding that the exchange rate in New York was as high as 14.85 bolivares to the U.S. dollar.

**5.** The guaranty also provides that the guarantor would be bound by any amendments in the loan agreement made by MHOCC. Further, the guaranty did not require that MHOCC make a demand on Sural when making any demand under the guaranty against the guarantor. (Exhibit C, Flax Affidavit, ¶ 4).

**6.** Southwire does not contest its liability for amounts which are not covered by the Sural deposits at the 4.3:1 exchange rate.

wire for 49 percent of all past due principal and interest amounts under Southwire's guaranty. The third claim seeks to hold Southwire liable for 100 percent of past due principal and interest amounts under the same Southwire guaranty on the theory that subsequent events and the operations of another agreement rendered Southwire automatically responsible for payment of 100 percent of the Sural loan obligations. MHOCC argues, in bringing its motion pursuant to F.R.Civ.P. 54(b), requesting judgment on the second claim, that the claim is separate and discrete from the other two and that there is no just reason to delay the entry of judgment on this claim. Southwire disputes both of these contentions.

In its second claim, MHOCC seeks $3,370,700.61 in U.S. dollars, as well as late interest up to the date of the present complaint.[7] The amount sought represents 49 percent of U.S. $6,878,980.83, which MHOCC claims is the sum of past due principal and interest. The last payment of principal and interest to MHOCC in U.S. dollars was the installment due in June, 1982. In December, 1982, MHOCC received a partial payment of interest from Southwire. However, Sural has submitted that through its deposits in bolivares, the last of which it made in December, 1983, it has covered, at the 4.3:1 exchange rate, the amount due on the note through that date.[8]

I

*Motion for summary judgment*

A. *The factual dispute*

In order to raise a genuine issue of fact to defeat a motion for summary judgment, Southwire must produce evidence to demonstrate the presence of a triable issue, conclusory assertions notwithstanding. *Chemical Bank v. Queen Wire & Nail Inc.*, 75 A.D.2d 999, 429 N.Y.S.2d 100, 102

(4th Dep't.1980). None of the statements to which Southwire points constitute such evidence.

Southwire argues that at least two of three possible interpretations of the agreement between Sural and MHOCC support its opposition to MHOCC's summary judgment motion. First, Southwire contends that a factfinder could determine that some of the bolivares deposits were made as payments so that its obligations under the terms of the guaranty are reduced to the extent of such payments. Second, Southwire argues, it could be found that the agreement modified the terms of Sural's underlying obligation on the note such that the due date for Sural's U.S. dollar payment in New York has not yet arrived, in consequence of which Southwire's own obligations under the guaranty have not yet matured. The third possible factual construction of the agreement—the one pursued by MHOCC—is that the deposits were considered collateral security, which apparently functioned to stay a suit by MHOCC against Sural, but which did not otherwise modify the terms of the loan or guaranty.

Southwire's payment theory—that the deposits in bolivares equalled partial payments on the Sural note—seems premised on two isolated statements and cannot be considered seriously as a valid interpretation of the Sural/MHOCC agreement. The first is from an affidavit by Alfredo Riviere Villamizar ("Riviere"), President of Sural. He writes that "it was the understanding that this agreement between MHOCC and Sural took the place of Sural's obligation to make payments on the Note in United States dollars in New York so long as Sural continued to make the agreed deposits of bolivares into the Venezuela accounts and to seek authority from the Venezuelan government to convert these bolivares to dollars at the preferred rate." (Riviere Affidavit, ¶ 10). The second is obtained

---

7. MHOCC also claims that in order to enter judgment on its second claim, late interest at the note rate must be calculated from the date of the second complaint to the date of judgment and added to the award. In addition, MHOCC maintains that it is entitled to attorneys' fees

and disbursements in enforcing its right under the guaranty. The court does not reach these contentions.

8. At the 4.3:1 exchange rate, Sural has deposited the equivalent of U.S. $8,417,332.37.

from a telex from Craig Reynolds, General Manager of Manufacturers Hanover Leasing of Venezuela, S.A. ("Manufacturers Leasing"), to Frederick Vincenzo, General Manager of Sural, dated March, 1983. Reynolds confirmed that Manufacturers Leasing had "been authorized ... to receive and house the past due interest payment of ... $551,682.22 [in U.S. dollars] in its bolivar equivalent at a rate of Bs 4.3:U.S. 1.00," (Exhibit B, Riviere Affidavit), and that interest earned on the deposit would be credited to Sural's account "against past due interest charges, future interest payments or other outstanding obligations...." *Id.* Neither statement, however, defines the parties' intentions. The first represents a conclusory assessment of the disputed agreement; the second describes a particular transaction without clarifying its context. More to the point, both stand up weakly against the evidence adduced by MHOCC.

In a telex dated October 21, 1983, from Riviere to Jerome B. Flax, Senior Vice President and Secretary of MHOCC, the agreement between MHOCC and Sural was described as a "[d]eposit of Bs 10,000,000 in Banco Mercantil on October 31, to the account of MHOCC as payment of interest and partial payment of principal." (Exhibit E, Flax Affidavit). Immediately upon receipt of this telex, Flax telephoned Riviere in Venezuela to inform him that the telex did not reflect the understanding between the parties concerning the deposits. Riviere sent a "corrected" telex later that same day. The telex provided that the "[d]eposit of Bs 10,000,000 ... [was] collateral security for the payment of interest and partial payment of principal." (Exhibit F, Flax

Affidavit).[9] Moreover, additional correspondence between the parties since October, 1983, supplying information to Sural's auditors, consistently reported Sural's debt to be past due, and Sural never objected to this characterization. In the face of this evidence, without more than Southwire offers, the court cannot find that some or any of the bolivar deposits by Sural were made as payment of its debt.

It is more difficult to evaluate Southwire's second hypothesis—whether the agreement deferred the due date of the U.S. dollar payments under the loan, and thus modified Southwire's obligations under the guaranty.[10] Riviere states in his affidavit that Sural's deposits were predicated on the knowledge that "MHOCC was accepting these deposits in lieu of insisting upon immediate payment in dollars of the sums which had become and were becoming due on the Note." (Riviere Affidavit, ¶ 19). The deposits, according to Riviere, meant that Sural was not in default in its payment obligations under the note, "and MHOCC would not sue for any payments" as long as bolivares were deposited. In short, "the obligation to make payments in U.S. dollars under the Note would be suspended." (Riviere Affidavit, ¶ 23). Riviere's words are the only register of this understanding.

The understanding, however, is not unequivocal evidence of the parties' intent to modify the loan vis-a-vis the due date of Sural's debt. It leaves open the possibility that MHOCC, in accepting the deposits, agreed only to forestall suit against Sural for the payments, but did not intend to modify the terms of the note and loan

---

9. Riviere stated that he was not concerned that the deposits were not " 'technically' payment" but were collateral security "so long as Sural continued to make these deposits in Bolivares, it would not be deemed by MHOCC to be in default in its payment obligations under the Note...." However, as MHOCC points out, even if MHOCC agreed not to sue Sural for default on the loan and continued to accept the bolivares deposits as collateral security, the arrangement does not indicate that MHOCC accepted the deposits as payment by Sural of its debt.

10. In practical terms, the argument is appealing. In consequence of the agreement between Sural and MHOCC no payments in U.S. dollars were made, yet MHOCC did not move to collect those payments from Sural. In this sense, the due date of U.S. dollar payments was extended. Nevertheless, the evidence which Southwire cites concerning the intent of the agreement does not substantiate a formal modification of the loan arrangement.

arrangement. MHOCC may have found it advantageous to avoid involving Sural in litigation, without detecting any benefit in foregoing its remedy against Southwire.[11] Certainly, an agreement by MHOCC not to sue Sural did not have to be one extending the loan's payment schedule.

Aside from Riviere's statements, the only evidence submitted by Southwire on the point of whether the agreement defers the due date of payments is a draft of a "Trust Guaranty Agreement", which Riviere maintains accurately reflected the bargain struck by Sural and MHOCC. A hand-written addition to the draft provided:

> During the terms of this trust agreement and provided that the Debtor/Settlor has faithfully performed its obligations hereunder, the Beneficiary agrees to abstain from instituting legal action or undertaking any other actions against the Debtor/Settlor.

(Exhibit G, Riviere Affidavit, fourth paragraph). This language omits reference to any deferral of the payment dates. It also fails to evidence any promise by MHOCC to refrain from pursuing its remedies against Southwire or another guarantor. Thus, Southwire has not set forth in evidentiary form possible factual issues with respect to the agreement, *Manufacturers & Traders Trust Co. v. Tronolone*, 71 A.D.2d 835, 419 N.Y.S.2d 370, 371 (4th Dep't.1979). The telex from Riviere to Flax (Exhibit F, Flax Affidavit) which describes the deposits as collateral security, is uncontradicted.

### B. *A Matter of law*

The parties have supplemented their arguments by briefing extensively the issue of whether as a matter of law the agreement between Sural and MHOCC modified the terms of the loan (and thus, the terms of the guaranty). Resolution of this question furnishes a second reason to grant summary judgment to MHOCC.

The required consideration to make the agreement legally binding was not given.[12] There must be consideration to support a valid extension of the time for payment under the note. 41 N.Y.Jur. Negotiable Instruments, § 237, and Sural failed to provide that consideration.

Consideration requires, as Southwire apparently concedes, some additional promise or performance.

> If the obligor loses nothing and the holder acquires nothing by an arrangement, there is no valid consideration, as where the only consideration for the promise of the holder is the obligor's performance of, or promise to perform. An agreement to pay, or a payment of, a part of a note or interest thereof after the sum thus paid has become due, is not sufficient consideration to support an extension of time for the payment of the note,

---

**11.** The benefit to MHOCC of allowing Sural to make bolivares deposits (and thus avoid litigation over the U.S. dollar payments) is obvious: it gives Sural the opportunity to obtain a more favorable exchange rate on bolivares, which strengthens its ability to make full repayment on the loan. That benefit is of course more obvious still if MHOCC can recover immediately some of the U.S. dollar payments due from Southwire. *See supra* note 4. It is not apparent, on the other hand, what benefit would accrue to MHOCC in postponing Southwire's obligations under the guaranty by modifying the due date of the payments under the note.

**12.** MHOCC's argument that the Sural/MHOCC agreement had to be in writing in order to modify the loan can be dismissed. MHOCC points out that because certain provisions concerning the loan arrangement had to be in writing, the statute of frauds renders invalid any oral contract touching those provisions. 56 NY Jur. Statute of Frauds § 151. The law is here inapplicable. The section of the loan arrangement which MHOCC cites, § 5.9, bears little relationship to any agreement between Sural and MHOCC concerning the bolivares deposit; the section provides that Sural must perform certain affirmative obligations vis-a-vis consents from the Venezuelan government. While, as MHOCC argues, § 5.9 also provides that Sural must take action "to assure the immediate and continued availability of dollars for all payments to the Company's obligations hereunder and under the Note and Security documents," the agreement between Sural and MHOCC cannot be said to modify this directive. The requirement that Sural make deposits sufficient to cover the payments due at the 4.3 exchange rate was a step in this direction, at least assuring the immediate availability in dollars of some portion of the payment.

since such payment is merely a part performance of a duty already existing. *Id.* at § 238. *See also National Commercial Bank & Trust Co. v. Bart Boat Co., Inc.*, 41 A.D.2d 159, 341 N.Y.S.2d 347, 349 (3d Dep't.1973) (performance of act that is legally required does not constitute adequate consideration). Yet, no matter what language is used to describe the deposits—whether "security" or "payment" is applied—Sural's deposits can be recognized readily as the effectuation, at least in part, of obligations already owing to MHOCC under the note and loan arrangement. Because Southwire has failed to demonstrate how Sural did anything other than "simply giv[e] the creditor that which was already due," (Defendant's Brief at 10),[13] the deposits cannot be construed as adequate consideration. As a matter of law, therefore, an oral agreement, even if shown to extend the due date of payments, is insufficient to modify the loan arrangement and Southwire's obligations pursuant to the guaranty remain as they were.

### 3. *Estoppel*

■ The last major argument Southwire raises in opposition to MHOCC's motion for summary judgment is that MHOCC should be estopped from asserting that Sural is in default because of Southwire's reliance upon MHOCC's promise not to sue. (Defendant's Brief at 13). Southwire has not, however, shown such reliance. It asserts that it is purchasing aluminum rods from Sural, rather than from other sources, to furnish Sural revenue to fund the deposits of bolivares, but the critical causal connection is unsubstantiated and the argument is, therefore, wholly conclusory. Moreover, Southwire fails to allege what injury it has suffered in consequence of the alleged modification of the loan agreement.[14] *See Republic Nat'l Bank of N.Y. v. Sabet*, 512 F.Supp. 416, 426 (S.D.N.Y.1980) (Conner, J.) (doctrine of estoppel requires showing that party asserting estoppel relied on actions of other party in way which would make it inequitable to allow other party to assert defense based on statute of frauds or lack of consideration).

## II

### *Rule 54(b)*

■ MHOCC has moved for an order directing the immediate entry of final judgment in its favor pursuant to Rule 54(b), F.R.Civ.P. Under that rule, entry of final judgment must be premised upon the court's finding that there is "no just reason for delay."[15] This circuit has reserved the power to grant a 54(b) certificate to "those rare cases where there exists 'some danger of hardship or injustice through delay which would be alleviated by immediate appeal.' *Brunswick Corp. v. Sheridan*, (2d Cir.1978), 582 F.2d 175, 183," [other citations omitted], *El-Marzouki Establishment v. Envtl. Research & Dev., Inc.*, 93 F.R.D. 661 (S.D.N.Y.1982) (Knapp, J.). The existence of such threatened hardship or injustice has not been shown here.

In *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980), a case on which MHOCC heavily relies, the district court found that

---

**13.** Southwire's argument that consideration exists because Sural's prior promises to MHOCC did not include any obligation on Sural's part to deposit any sums in bolivares in MHOCC's Venezuelan accounts is specious. While those deposits differed in form—bolivares as opposed to dollars—the substance of the payment obligation had been established by the note and loan terms.

**14.** Clearly Southwire cannot rely upon Sural's reliance and injury in asserting that MHOCC is estopped from pursuing claims against it. *See Gratton v. Dido Realty Co., Inc.*, 89 Misc.2d 401, 391 N.Y.S.2d 954 (Sup.Ct. Queens Co.1977), *aff'd*

63 A.D.2d 959, 405 N.Y.S.2d 1001 (2d Dep't 1978).

**15.** The court must first determine that it is dealing with a "final judgment." In other words, there must be a decision on a cognizable claim for relief which is final in the sense that it disposes of an individual claim entered in the course of a multiple claims action. *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 7, 100 S.Ct. 1460, 1464, 64 L.Ed.2d 1 (1980). Because the court cannot certify that there is no just reason for delay, it does not deal directly with Southwire's contentions concerning the non-separability of claims in this action.

Curtiss-Wright "would suffer severe financial loss from nonpayment of the $19 million judgment because current interest rates were higher than the statutory prejudgment rate, a situation compounded by the large amount of money involved." *Id.* at 6, 100 S.Ct. at 1464. A similar finding cannot be made in this case. MHOCC merely implies that Southwire's solvency is at issue. Moreover, delaying appeal until all issues can be presented to the circuit court at once "is particularly desirable where, as here, the adjudicated and pending claims are closely related and stem from essentially the same factual allegations." *Cullen v. Margiotta,* 618 F.2d 226, 228 (2d Cir.1980). MHOCC's Rule 54(b) motion is, therefore, denied.

Summary judgment is granted on the second claim in MHOCC's complaint and its motion to file an amended complaint is granted.

### III

*Rule 67*

While the present motion was *sub judice,* MHOCC filed a new motion pursuant to Rule 67, F.R.Civ.P. and 28 U.S.C. §§ 2041 and 2042 directing that the sum of $681,628.68 formerly deposited with the registry of this court by Southwire pursuant to F.R.Civ.P. 67 be turned over to it immediately. This motion also reiterates MHOCC's previous requests for summary judgment and the entry of final judgment on the second claim. Since no new issues have been raised with respect to the two latter issues, the ruling above is dispositive.

The additional issue raised is whether the amount admittedly due from Southwire to MHOCC for the period January 1, 1984, through March 31, 1984,[16] should be turned over to MHOCC. Southwire had deposited this money with the court on April 4, 1984.

MHOCC seeks the release of these funds to it because it argues that Rule 67 is inapplicable.

Rule 67 provides that funds may be placed on deposit with the court until it determines how the funds should be divided among the parties to a suit. The rule may be invoked only where there is a dispute concerning the funds. *Baxter v. United Forest Products Co.,* 406 F.2d 1120, 1126 (8th Cir.1969), *cert. denied,* 394 U.S. 1018, 89 S.Ct. 1635, 23 L.Ed.2d 42 (1969) citing *United States v. Balfour, Guthrie & Co., Ltd.,* 192 F.Supp. 60, 61 (S.D.N.Y.1961) (Sugarman, J.). MHOCC correctly contends that no dispute exists here since Southwire does not contest its liability to MHOCC in regard to the sum it deposited with the court.

The fact that MHOCC seeks to apply that money to amounts owed to MHOCC before December 31, 1983,[17] and not to extinguish 49 percent of the installment due on March 31, 1984, does not alter matters.

Southwire argues that because it denied that it is obligated to MHOCC for amounts due before December 31, 1983, those funds are in dispute and the $681,628.68 if applied to such debt, would similarly be in dispute. Consequently, it maintains, Rule 67 is applicable. This dispute, however, is precisely the one the court resolved in awarding summary judgment to MHOCC. The court found Southwire currently obligated to pay 49 percent of the unpaid debt owed by Sural to MHOCC. Therefore, in the absence of any dispute concerning past or present amounts due, Southwire cannot invoke Rule 67 to bar MHOCC from access to the $681,628.68 simply because the entire dispute has not yet been resolved. Nor may it restrict MHOCC's application of the funds toward Southwire's most recent obligations. Southwire can suffer no harm in any case.

---

**16.** The $681,628.68 represents 49% of the regular installment payment due on March 31, 1984, under the terms of the promissory note of Sural in favor of MHOCC.

**17.** The note provides in effect that any amounts MHOCC receives may be applied first to extinguish the interest that has been due and owing the longest. (Exhibit B, Cantor Affidavit, April 19).

Should it be determined later on appeal that summary judgment was awarded incorrectly, MHOCC will be able to adjust its accounting books accordingly.

IT IS SO ORDERED.