**GULF STATES UTILITIES CO.,**
**Plaintiff-Appellee,**
**v.**
**ALABAMA POWER CO., Georgia Power Co., Gulf Power Co., Mississippi Power Co., the Southern Co., and Southern Company Services, Inc., Defendants-Appellants,**

**Louisiana Public Service Commission,**
**Movant-Appellant.**

No. 86–2802.

United States Court of Appeals,
Fifth Circuit.

Aug. 25, 1987.

As Amended on Denial of Rehearing
and Rehearing En Banc
Nov. 9, 1987.

---

Charles M. Crook, Montgomery, Ala., Rodney O. Mundy, James H. Miller, III, Dan H. McCrary, Birmingham, Ala., for Alabama & Southern Co., Services.

Robert H. Forry, Robert P. Edwards, Jr., Atlanta, Ga., for Georgia & The Southern Co.

Basile J. Uddo, Frank J. Uddo, Elizabeth H. Porter, New Orleans, La., for LPSC.

Ben H. Stone, Gulfport, Miss., for Mississippi Power Co.

G. Edison Holland, Jr., Robert L. Crongeyer, Pensacola, Fla., for Gulf Power Co.

John G. Bissell, Beaumont, Tex., for all petitioners.

Orgain, Bell & Tucker, Paul W. Gertz, Beaumont, Tex., Taylor, Porter, Brooks & Phillips, Tom F. Phillips, Fredrick R. Tulley, Baton Rouge, La., for plaintiff-appellee.

Before WILLIAMS and HILL, Circuit Judges, and MENTZ[*], District Judge.

JERRE S. WILLIAMS, Circuit Judge:

Gulf States Utilities sued the Southern Companies over two contracts for the purchase and sale of electricity. The district court took jurisdiction over the case pursuant to 28 U.S.C. §§ 1332 (diversity of citizenship) and 2201 (declaratory judgment). Southern appeals, asserting lack of jurisdiction in the district court.[1] Southern's contention is that the Federal Power Act preempts Gulf States' claims and that only the Federal Energy Regulatory Commis-

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

1. The district court denied Southern's motion to dismiss for lack of jurisdiction and certified the jurisdiction issue for interlocutory appeal.

sion may resolve this case. We affirm the district court's exercise of jurisdiction.

## I. *Facts*

■ Gulf States Utilities ("GSU") and the Southern Companies ("Southern") are public utilities engaged in the interstate purchase and sale of electricity. As such, they are regulated by the Federal Power Act ("FPA"), 16 U.S.C. § 824 *et seq.* Under the FPA, public utilities are limited to charging just and reasonable rates for electricity sold in interstate commerce. 16 U.S.C. § 824d(a). The Federal Energy Regulatory Commission ("FERC") has exclusive jurisdiction over interstate wholesale power rates: utilities must file their rates with the FERC, and the FERC can approve or alter such rates. 16 U.S.C. § 824e(a); *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 106 S.Ct. 2349, 2352, 90 L.Ed.2d 943 (1986).

Southern makes electricity mainly from coal, while GSU uses mainly oil and gas to produce its electricity. GSU sells most of its electricity to customers in Louisiana and Texas at rates regulated by, respectively, the Louisiana Public Service Commission ("LPSC") and the Public Utilities Commission of Texas ("PUCT").

In 1982, GSU contracted to buy electricity from Southern through 1992. Apparently, GSU forecasted that through 1992 (1) demand for its electricity would increase and (2) electricity produced by coal would be cheaper than electricity produced by oil and gas. GSU now alleges, however, that both (1) oil and gas prices and (2) the demand for electricity in Louisiana and Texas fell after 1982. In addition, the PUCT allegedly reduced the rate that GSU may charge its retail customers, refusing to allow GSU to recover the full cost of the electricity it buys from Southern. Because of these factors, GSU wants to avoid its contractual obligations to buy electricity from Southern.

### a. *The GSU—Southern Contracts*

On February 25, 1982, GSU and Southern signed two contracts. One contract,

the Unit Power Sales ("UPS") contract, provided that GSU would buy 500 megawatts ("MW") per year of electricity through 1992. It also provided:

§ 2.2.1: In the event either party desires to increase or decrease capacity sales or purchases ..., the parties agree to negotiate in good faith and with diligence to proceed to evaluate alternatives which may reasonably provide for such desired change in capacity; provided, that no such change shall be made except upon mutual written agreement of the parties hereto.

The other contract, the "Interchange" contract, governed the connections between GSU's and Southern's facilities. The Interchange contract provided, in § 9.4, that "[i]n the event this CONTRACT is changed or modified by any regulatory agency or authority, either party, if adversely affected, shall have the right to negotiate for the necessary relief to alleviate said adverse effects...."

On May 12, 1982, GSU and Southern amended the UPS contract to increase the amount of electricity purchased after May 1985 to 1,000 MW/year. As required by the FPA, GSU and Southern filed the Interchange and amended UPS agreements with the FERC. *See* 16 U.S.C. § 824d(c).

On December 6, 1983, GSU and Southern again amended the UPS agreement, this time to *reduce* the amount of electricity to be purchased by GSU between 1985 and 1992.[2] Also on December 6, 1983, GSU and Southern amended the Interchange contract by adding "Schedule E." Under Schedule E, GSU agreed to supplement its basic UPS purchases between 1985 and 1992 by buying available "Long Term Power." The term "Long Term Power" means "capacity and energy existing on [Southern's] system ... not needed at that time ... to meet its own system requirements (including power used for pumping at pumped storage hydroelectric projects) and [Southern's] other power sale commitments ... taking precedent before delivery under this Schedule [E]." In all, GSU agreed to buy enough available Long Term Power to

---

**2.** The second amended UPS contract called for GSU to buy 500 MW/year until 1985 and then 400 MW in 1985, 500 MW in 1986, 600 MW in 1987, and 700 MW/year in 1988–1992.

maintain its total purchases from Southern at 1,000 MW/year between 1985 and 1992.[3] Long Term Power is cheaper than UPS power, and the FERC approved Schedule E and the 1983 amendments to the UPS contract.

### b. *The Trouble Since 1983*

As set out above, GSU claims that demand for its electricity has decreased and that lower oil and gas prices have made Southern's coal-generated electricity relatively more expensive than electricity made from oil and gas. In addition, the PUCT reduced the rates that GSU could charge its customers and did not let GSU pass through to customers the cost of electricity bought from Southern. For these and other reasons, GSU requested renegotiation of its obligations under the UPS and Interchange contracts. GSU and Southern negotiated unsuccessfully until July 2, 1986, when GSU sued Southern in federal district court.

GSU's complaint explained that both GSU and Southern originally assumed that their contracts would be mutually beneficial through 1992 but that unforeseeable market conditions and PUCT decisions have spoiled the deal for GSU. GSU apparently searched the lawbooks to unearth every conceivable cause of action. First, it claims that Southern refused to renegotiate its contracts in good faith. This failure allegedly constitutes a breach of contract and also a breach of an independent duty to act in good faith. GSU also claims that, in making the contracts, Southern never intended to renegotiate in good faith but fraudulently promised to do so. GSU also pleads that Southern "unconscionably" exploited GSU and breached an "implied warranty" to renegotiate, in violation of the Texas Deceptive Trade Practices Act ("DTPA"). GSU also alleges that unforeseeable actions of the PUCT and changes in market conditions (1) legally excuse GSU's performance, (2) render GSU's performance commercially impracticable, (3) frustrate the purpose of the GSU–Southern

contracts to serve the public, and (4) manifest mutual and unilateral mistakes in the making of the contracts. GSU also claims that its contracts with Southern are unconscionable. Finally, GSU claims that Southern has exaggerated the amount of available "Long Term Power" that GSU must buy under Schedule E. Specifically, GSU asserts that Southern is engaging in "cannot lose" dealing by buying inexpensive, oil-and-gas-generated electricity from GSU and selling it right back to GSU at a profit under Schedule E. GSU seeks money damages and an order voiding the contracts.

The main issue in this appeal is whether the district court—or only the FERC—has jurisdiction over GSU's multi-faceted complaint. A subordinate issue is raised because shortly after filing suit GSU stopped making payments to Southern and started depositing the money due under its contracts into the registry of the district court. Over Southern's objection, the district court accepted these funds under Fed.R. Civ.P. 67. Southern claims on appeal that the deposits are improper. Finally, a third issue is raised by a motion of the LPSC to intervene in GSU's suit under Fed.R.Civ.P. 24. The district court denied the LPSC's request, and the LPSC appeals.

In this opinion, we first hold that the district court does have jurisdiction over at least some aspects of this suit because the FERC's jurisdiction over GSU's complaint is not exclusive (Part II) or primary (Part III). Then we hold that the district court did not abuse its discretion by allowing GSU to deposit with the court payments allegedly due under the contracts (Part IV), but that the district court erred in barring intervention in this litigation by the LPSC (Part V).

### II. *Exclusive Jurisdiction*

#### a. *The Filed Rate Doctrine*

The FPA gives the FERC exclusive jurisdiction over interstate wholesale electricity rates. *See* 16 U.S.C. §§ 824–824e. The FPA permits utilities to charge only just

---

**3.** In other words, GSU agreed to buy up to 600 MW of available long term power in 1985, 500 MW in 1986, 400 MW in 1987, and 300 MW/year in 1988–1992. These amounts, plus the UPS amounts, would bring GSU's total purchases to 1,000 MW/year for the years 1985–1992.

and reasonable rates and to file their rates and sales contracts with the FERC. 16 U.S.C. § 824d(a-c). The FERC may review the filed rates and, if it finds a rate to be unjust or unreasonable, it may fix a just and reasonable rate. 16 U.S.C. § 824e(a).

■ Through the FPA, Congress preempted states, state courts, and even federal courts from acting in areas reserved exclusively for the FERC.[4] For example, under the FPA, a buyer or seller of electricity may not sue in court to change the filed rate for any reason. *See e.g., Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 250, 71 S.Ct. 692, 694, 95 L.Ed. 912 (1951) (under the "filed rate doctrine," a court may neither adjudicate whether a rate is reasonable nor replace a filed rate with a more reasonable one).

■ In addition, the FPA forbids a state or state agency to impose a rate different from the filed rate or to interfere with the purchasing or transporting of electricity in a way that affects rates. In *Transcontinental Gas Pipeline Co. v. State Oil & Gas Board of Mississippi,* 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986), a pipeline company contracted to buy gas from some but not all producers in a common gas pool.[5] Drawing gas from a few wells in the pool threatened to deplete the entire pool. The state's gas board sought to protect the correlative rights of all producers in the pool and thus required the pipeline company to buy gas, if at all, from *all* producers in proportion to their respective ownership interests in the pool. The Supreme Court struck down this regulation because it improperly interfered with the

federal scheme regulating interstate gas sales, which allows and encourages pipeline companies to buy gas from the cheapest sources. The Court advised states to prevent physical and economic waste of gas by regulating the *production*, rather than the purchasing, of gas. *Accord Northern Natural Gas Co. v. State Corporation Commission of Kansas,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963) (striking down a similar state regulation requiring Northern to buy from all producers in a field: the regulation indirectly would affect Northern's rates and infringe the NGA's scheme).

Most recently, *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986), also held preempted a state regulation over a utility's electricity rates. Nantahala and a company called Tapoco produced electricity for the Tennessee Valley Authority ("TVA"). In return, the TVA provided Nantahala and Tapoco with a fixed quantity of low-cost power, called "entitlement" power. Tapoco resold its share of the entitlement power to ALCOA Corporation, while Nantahala sold its entitlement power, plus power it purchased from other sources at high cost, to wholesale and retail customers in North Carolina. According to the FERC, Tapoco received 77.5 percent of the TVA entitlement power, and Nantahala received 22.5 percent. Under the FERC's allocation, Nantahala could include only 22.5 percent of the entitlement power among its sources of electricity; that is, it had to compute its costs and set its rates as if it received only 22.5 percent of the entitlement power and purchased the rest.

---

4. Under the preemption doctrine announced in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), a state may not regulate activity that falls plainly within the scope of federal regulation. Preemption does not apply to state regulation "that affects a federal scheme only peripherally or involves deeply held local concerns." *Mayon v. Southern Pacific Transportation Co.,* 805 F.2d 1250, 1252 (5th Cir.1986). In deciding whether to apply the preemption doctrine, the inquiry is to weigh the state interest in regulating the activity in question against the potential for interference with the federal regulatory scheme or interstate commerce. *Id.; Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847,

25 L.Ed.2d 174 (1970). "Preemption applies when the state law poses a 'realistic threat of interference with the federal regulatory scheme.'" *Mayon,* 805 F.2d at 1252 (quoting *Farmer v. United Brotherhood of Carpenters and Joiners of America,* 430 U.S. 290, 305, 97 S.Ct. 1956, 1966, 51 L.Ed.2d 338 (1977)).

5. *Transcontinental* was decided under the Natural Gas Act ("NGA"), rather than the FPA, but the two statutes have nearly identical provisions, and we may rely on decisions interpreting the relevant portions of either statute. *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 2930 n. 7, 69 L.Ed.2d 856 (1981).

The North Carolina Utilities Commission ("NCUC") regulated the rates of Nantahala's retail sales in North Carolina. In its rate-making procedures, the NCUC determined that Nantahala actually received 24.5 percent of the low-cost entitlement power allocated to Nantahala and Tapoco, rather than 22.5 percent as determined by the FERC. Thus, the NCUC decided that the FERC underestimated the amount of low-cost power available to Nantahala and ordered Nantahala to reduce its rates to reflect the NCUC's allocation of low-cost electricity. The Supreme Court invalidated the NCUC's allocation. 106 S.Ct. at 2357. The FERC allocation directly affected Nantahala's rates and thus bound the NCUC, and no court could adjudicate whether the FERC allocation was reasonable. *Id.*

The FPA also preempts some private causes of action for breach of contract. In *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981) (*"Arkla"*), the Supreme Court held that a seller (or buyer) may not sue to change a filed rate even if the buyer (or seller) has contracted to change that rate. Hall sold gas to Arkla from the Sligo Field for a fixed price, but Arkla promised to pay Hall as high a price as it paid to any other producer for Sligo Field gas. Arkla then bought Sligo Field gas from the United States for a higher price than it paid to Hall. Hall discovered Arkla's breach and sued to recover the difference between the price paid to him and the price Arkla paid to the United States. The Supreme Court rejected Hall's suit and reiterated the filed rate doctrine announced in *Montana-Dakota:* regulated sellers must charge only the rate filed with the FERC, and only the FERC—not a court—may change an unreasonable filed rate. 453 U.S. at 577–78, 101 S.Ct. at 2930–31. Moreover, even the FERC may not alter a rate retroactively or order reparations for unreasonable charges in the past. *Id.* Hall wanted simply a retroactive rate increase, so his claim, based on state contract law, was preempted. *Id.* at 579, 584, 101 S.Ct. at 2931, 2934. Hall's only recourse was to ask the FERC to change the filed rate prospectively.

### b. *Jurisdiction Over GSU's Complaint*

With this discussion of case law on preemption in mind, we now consider the status of GSU's many state law causes of action. We review these claims and hold that at least some of them are not preempted by the FPA, although the FPA does limit GSU's available relief.[6]

■ Some of GSU's claims involve Southern's alleged failure to negotiate under UPS § 2.2.1 or Interchange § 9.4. GSU claims that, if Southern had negotiated in good faith, it would have agreed to file lower rates with the FERC. The FPA clearly preempts this claim. The district court may not compensate GSU on the theory that it would have paid rates different than the filed rates if Southern had not breached. *See Arkla.* Other relief, however, may be available to GSU for Southern's alleged failure to negotiate. For instances, UPS § 2.2.1 refers to renegotiations regarding "change[s] in *capacity.*" (emphasis added). GSU might be able to show that good faith negotiations would have reduced the *amount purchased* (not the rate) under the UPS and Interchange contracts and that GSU was harmed by taking the quantity required in the filed contracts, perhaps by overloading GSU's capacity. This claim would not be preempted by the FPA. Also, GSU may prove that it suffered damages that are unrelated to any actual or desired rates—such as attorneys' fees or other expenses incurred during the negotiations. In addition, the district court could order Southern to negotiate in good faith in the future.[7]

---

6. As we explain below, further discovery and more specific pleadings may reveal that the FPA does preempt some of GSU's claims. At this time, some of GSU's claims are ambiguous; they may or may not be preempted, and the district court has jurisdiction over such claims, at least for now.

7. The FERC itself, in an order defining our aspect of the scope of its jurisdiction in this dispute, decided that it lacked exclusive jurisdiction over GSU's claim that Southern refused to negotiate in bad faith. *See Southern Company Services, Inc.,* 37 FERC ¶ 61,256 (1986).

GSU also claims that the UPS and Interchange contracts should be set aside because Southern committed fraud and deceptive trade practices by falsely promising to negotiate in good faith. Assuming *arguendo* that such relief is available under state law, the FPA would not necessarily forbid the district court to set aside contracts obtained unconscionably or by fraud.[8] The FERC does not warrant that filed contracts—such as the UPS and Interchange Agreements—are free from fraud. By setting aside the contracts, the district court would not interfere with the FERC's rate-making powers.[9] We stress, however, that the district court may not set aside the contracts on the theory that Southern's rates are too high. *See Montana-Dakota.*

Further, GSU claims that its obligations should be excused because of commercial impracticability, frustration of purpose, changed conditions, mutual mistake, unilateral mistake, unconscionability, and the PUCT's actions. Southern warns that GSU simply wants to pay lower rates for its electricity and is trying to circumvent the FPA and the FERC with artful pleading. At this early stage in the litigation, GSU has not explained whether commercial impracticability, frustration, or any other defense applies (1) because of high rates (in which case the FPA would preempt) or (2) because of reasons unrelated to rates.

The district court would have jurisdiction if GSU claimed that it cannot take Southern's electricity *regardless of price.* If, however, GSU can fulfill its purchase obligations at a lower rate, then GSU seeks only rate relief not available in district court. For instance, GSU claims that state law excuses its performance for "frustration of purpose." The FPA would preempt a claim that frustration occurs because of high rates; the FPA would not preempt a claim that frustration occurs by buying any electricity from Southern at any price. Perhaps, for instance, accepting additional capacity would overload and damage GSU's facilities. Dismissal for lack of jurisdiction at this point would be premature, although Southern can request GSU to plead its claims with more specificity. *See* Fed.R. Civ.P. 12(e).

Finally, GSU complains that Southern has sold more than it should have under Schedule E by overstating the amount of available "Long Term Power." The FPA does not preempt this claim. Unlike Hall in *Arkla*, GSU does not seek relief based on a rate different from the filed rate. Rather, GSU complains about the *quantity* sold *at the filed rate* under Schedule E. The district court could order Southern to refund amounts wrongfully paid in the past and/or could order Southern to change its calculation of available Long Term Power in the future.

In sum, we hold that the district court properly denied Southern's motion to dismiss for lack of subject matter jurisdiction.

### III. *Primary Jurisdiction*

The doctrine of "primary jurisdiction" recognizes that an administrative agency, such as the FERC, should be able to participate in decisions affecting a regulated industry, even when the agency does not have exclusive jurisdiction. The doctrine eludes fixed application, but sometimes a court must stay its own proceedings and defer to let an agency "have the first word." *Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 532 F.2d 412, 417 (5th Cir.1977), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977). The doctrine applies when agency

---

**8.** The Supreme Court in *Arkla* did not decide whether it would have had jurisdiction if Hall showed that Arkla *defrauded* him of higher rates. 453 U.S. at 583 n. 13, 101 S.Ct. at 2933 n. 13 ("We save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct."). The case before us is easier than *Arkla* would have been if Hall had shown fraud. GSU alleges that Southern fraudulently promised, not to pay higher rates, but to renegotiate in good faith.

**9.** Of course, by setting aside the contracts, the district court would affect the filed rates by eliminating them. We do not believe, however, that Congress meant through the FPA to preempt such indirect effects.

As set out above, we express no opinion about what remedies, if any—including set aside—may be available to GSU.

action would produce needed uniformity in an area or when the agency has "special competence" over the issue to be decided. *See United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); *accord Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 515 n. 11 (5th Cir.1982) (defer to agency if it is "better equipped than court's by specialization, by insight gained through experience, and by more flexible procedures"), *cert. denied*, 464 U.S. 335, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984) (defer if issue requires uniformity of resolution and the agency's "expert consideration"). Sometimes, the courts should allow an agency to interpret a contract, especially when "words ... are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper applications." *Western Pacific Railroad*, 352 U.S. at 65–66, 77 S.Ct. at 166 (holding that the Interstate Commerce Commission, not the court, should decide whether napalm gel bombs without fuses or bursters are "incendiary bombs" within the meaning of an ICC tariff).

■ We have said that a district court in its discretion should invoke primary jurisdiction and defer only if the benefits of obtaining the agency's aid outweigh the need to resolve the litigation expeditiously. *Mississippi Power*, 532 F.2d at 419. The district court may consider many factors in striking this balance, including: how agency action will aid the litigation; whether the litigation involves conduct requiring continuing supervision by the agency; whether the issues to be litigated are unique to regulated industries; and whether proceedings already are pending before the agency. *Id.* at 419–20.

In the case before us, both parties have initiated proceedings before the FERC, but the district court refused to stay the litigation pending the FERC's decision. Since the district court's decision and oral argument in this appeal, the FERC's Administrative Law Judge ("ALJ") rendered an initial decision in the GSU–Southern proceedings. Thus, even though the initial

decision is likely to be re-considered by FERC, we now have guidance as to the actual scope of the FERC's inquiry.

In his initial decision, the ALJ explained that he could grant relief only by finding that the filed contracts were "unjust, unreasonable, unduly discriminatory, or preferential" under 16 U.S.C. § 824e(a). Using this standard, and reviewing almost a month of testimony, he found that Southern's rates are based on Southern's costs and thus are not unreasonable. He also found that (1) changed market conditions were foreseeable and, in any event, do not make the contracts unjust or unreasonable; (2) GSU has benefited from the contracts, and the contracts are not unjust or unreasonable simply because they yielded fewer benefits than GSU expected; (3) GSU's involvement in a nuclear project, not these contracts, caused GSU's financial woes, and the contracts do not unjustly or unreasonably burden GSU; and (4) the contracts are not unjust or unreasonable even though Southern is larger than GSU. Regarding UPS § 2.2.1, the ALJ ruled: "Section 2.2.1 does impose an obligation upon the parties to negotiate in good faith and with diligence. Failure to negotiate in good faith and with diligence would constitute a breach of contractual obligation for which a court could fashion a remedy." Thus the ALJ specifically accepted the role of a court in fashioning a remedy for breach of contract.

As to other matters, the ALJ found that "the capacity and energy provided by Southern to GSU under Schedule E constitutes 'Long Term Power' as that term is defined in [Schedule E]." He also addressed the effect of the PUCT's refusal to allow GSU to pass-through the cost of electricity bought from Southern and ruled that the PUCT decision—whether correct or not—does not render the contract unreasonable or unjust. The ALJ further ruled that the PUCT decision does not excuse GSU's obligations under its contracts.

■ In most respects, the ALJ confined his inquiry to the "just and reasonable" standard in 16 U.S.C. § 824e(a) and did not address the state law issues at stake in the

litigation. The district court, of course, has no authority to order "just and reasonable" results under 16 U.S.C. § 824e(a). Given the factors discussed in *Mississippi Power*, the district court did not err in refusing to apply the doctrine of primary jurisdiction. As we explain above, however, the district court may not grant relief to GSU on the theory that its *rates* are too high, unconscionable, or the cause of commercial impracticability or any other problems.

Three findings of the ALJ as set out above raise particular doubts as to the FERC's primary jurisdiction. These are: (1) the changed conditions about which GSU complains were foreseeable, (2) Southern sold only available Long Term Power under Schedule E, and (3) the PUCT's decision to disallow GSU's pass-through did not excuse. GSU's obligations with Southern. The ALJ stated these findings without elaboration, and no evidence suggests that the FERC proceedings developed a factual record that would aid the district court. *Cf. Mississippi Power*, 532 F.2d at 420 ("Development of the factual context by those expert in the area is an established basis for primary jurisdiction."). These findings do not require the district court to stay its litigation. The ALJ's findings are not final; the FERC may modify or reverse them. Once the FERC issues its final decision, the district court may adapt its own decision to accommodate the FERC's as necessary. Moreover, the ALJ may have exceeded the scope of his primary jurisdiction, because these findings do not seem to require the FERC's special expertise or a uniform rule throughout the nation. Some of them in their present form may not even be within FERC's jurisdiction. Unless and until the FERC adopts the ALJ's findings, we need not decide their effect on the litigation.

Finally, the ALJ ruled that UPS § 2.2.1, requiring good faith renegotiation, does not apply to the Interchange contract. Under the guidelines set out in *Western Pacific Railroad*, the district court is not bound by this finding but can interpret the contracts itself as a matter of law. *See* 352 U.S. at · 65–66, 77 S.Ct. at 166.

In sum, the district court did not err in refusing to stay the litigation pending action by the FERC. The district court may address GSU's claims that Southern failed to renegotiate in good faith, that the UPS and Interchange contracts were induced by fraud, that Southern is selling an improper amount of electricity under Schedule E, and that the *quantity* of electricity GSU must take under its contracts excuses its performance under various theories of state contract law. As the litigation proceeds and GSU's theories become clearer, the district court may find that the FERC has exclusive or primary jurisdiction over some of GSU's claims.

## IV. *Rule 67 Deposits*

As set out above, GSU filed suit on July 2, 1986. On July 11, 1986, it moved to deposit in the district court's registry the funds allegedly due to Southern. The district court granted GSU's motion and accepted deposits starting in July 1986 pursuant to Fed.R.Civ.P. 67.

> Rule 67, as amended in 1983, provides: In any action in which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing, whether or not that party claims all or any part of the sum or thing.

The purpose of Rule 67 is "to relieve the depositor of responsibility for a fund in dispute," such as in an interpleader action. *See* 12 C. Wright & A. Miller, *Federal Practice & Procedure* § 2991 (West 1973) (footnotes omitted). The 1983 amendment to Rule 67 makes clear that the depositor may have an interest in the deposited funds. Once funds are deposited, the court should determine ownership and make disbursements. *See Baxter v. United Forest Products Co.*, 406 F.2d 1120 (8th Cir.) (court holds deposits as trustee for the true owner), *cert. denied*, 394 U.S. 1018, 98 S.Ct. 1635, 23 L.Ed.2d 42 (1969); *Manufacturers' Hanover Overseas Corp. v. South-*

*wire Co.*, 589 F.Supp. 214, 221 (S.D.N.Y. 1984).

 The district court did not abuse its discretion by accepting GSU's deposits. While GSU's claim for breach of UPS § 2.2.1 alone might not place the deposited amounts "in dispute," GSU also claims that its contracts should be set aside as of July 2, 1986 and that it does not owe Southern the deposited money. Southern, of course, claims that GSU owes it the deposited funds. Thus, the funds genuinely are in dispute.[10]

*Baxter v. United Forest Products, supra,* is not to the contrary. In *Baxter,* the plaintiff had bought a business and agreed to pay the purchase price in four installments. If he failed to make any payment, he forfeited the business plus any payments made before the default. When the plaintiff/buyer discovered fraud by the seller in the making of the sales contract, he sued for money damages. At the same time, however, he affirmed the validity of the contract and moved to deposit the remaining installments in the court's registry to avoid the contract's harsh forfeiture provisions. The Court of Appeals rejected this use of Rule 67: the plaintiff had no interest in the installments after he had affirmed the contract, so the deposits belonged to

the seller and were not "in dispute." GSU, unlike the buyer in *Baxter,* denies that it owes the deposits to Southern.[11]

GSU could have breached its contracts by and withheld money from Southern and the court, but we see no reason to force GSU to do so. We do not fault GSU for making deposits under Rule 67 as the district court decides those are proper.[12] Admittedly, regardless of the outcome of this case, Southern will be entitled to be paid for gas already taken, but it is in the discretion of the district court under Rule 67 to decide how much of the payments from GSU should be held in the court. On this record, a partial release of these funds has not been adjudicated by the district court. The district court did not abuse its discretion.

## V. *Intervention by the LPSC*

As set out above, the district court denied the LPSC's motion to intervene pursuant to Fed.R.Civ.P. 24. As we explain, a decision of this Court interpreting Rule 24 mandates that we reverse the district court and allow the LPSC to intervene.

Rule 24 provides:

**(a) Intervention of Right.** Upon timely application anyone shall be permitted to

---

**10.** *Cf. Prudential Insurance Co. v. BMC Industries, Inc.,* 630 F.Supp. 1298 (S.D.N.Y.1986). Prudential bought bonds from BMC and received interest payments. Prudential sought to set aside the bond sale for fraud. Prudential, fearing that accepting BMC's interest payments might seem to evidence its acceptance of the entire sales contract, tried to deposit into the court's registry the interest payments it received. The court rejected Prudential's deposits, holding that the interest payments were not in dispute: Prudential owned them regardless of the outcome of its BMC litigation and sought through Rule 67 only to avoid the appearance of ratification.

**11.** Relying on *Saw Mill Broadcasters, Inc. v. Moore,* 561 F.Supp. 1139 (S.D.N.Y.1983), Southern argues that GSU must show likelihood of success on the merits before making deposits under Rule 67. *Saw Mill* imposes no such requirement. Saw Mill leased a tract of land and obtained a "right of first refusal" to buy it. The lessor sold the land, and Saw Mill sued, claiming that the lessor violated its option to buy. The district court did not allow Saw Mill to deposit its lease payments with the court, noting that, based on the preliminary evidence, Saw

Mill had no apparent chance of succeeding on the merits. *Id.* at 1141.

*Saw Mill* simply holds that a district court, in exercising its discretion under Rule 67, may consider the would-be depositor's chances for success on the merits. In the case before us, we perceive no abuse of discretion by the district court.

**12.** The FERC found that GSU did not violate the filed rate doctrine by depositing funds with the court, because the deposits equaled the amounts due to Southern under the filed rates.

We need not decide whether GSU breached its contracts by making deposits. Southern argues, however, that GSU has accepted electricity since it started making deposits and that GSU eventually must pay for such electricity. Until the district court determines how much GSU owes, it may continue in its discretion to accept deposits.

We do not expect parties hereinafter to inundate district courts with deposits: breaching parties probably can be expected usually to keep disputed funds in their own treasuries.

intervene ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

**(b) Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

 The LPSC meets all of the requirements of Rule 24(a) and may intervene as of right. First, it filed a timely motion to intervene. Second, it has an interest in the GSU–Southern litigation. Louisiana law charges the LPSC to "investigate the reasonableness and justness of all contracts" made by GSU, and the LPSC may "disallow as an operating expense of [GSU]" any unreasonable payments GSU makes to Southern. La.Rev.Stat.Ann. § 45:1176 (West 1982). The LPSC is the only government party seeking to intervene, and it will have to determine whether GSU may pass-through to consumers the cost of its purchases from Southern. Third, the LPSC must intervene *now* to protect GSU's customers, before the results of this litigation are *res judicata*. Finally, though the LPSC's views of this case are not yet known, we cannot assume that GSU will represent the LPSC's interests.

Our analysis of Rule 24(a) is controlled by *New Orleans Public Service, Inc. v. United Gas Pipeline Co.*, 690 F.2d 1203 (5th Cir.1982) ("*NOPSI I*"). In *NOPSI I*, we held that the mayor and city council members of New Orleans could intervene as of right in a suit between NOPSI and its gas supplier, because the intervenors had a "statutory obligation to oversee NOPSI's fiscal and public responsibilities." *Id.* at 1209. After deciding *NOPSI I*, we learned the law had been changed and that the LPSC—not the city officials—had been given the authority to regulate NOPSI's rates, and we reversed *NOPSI I*. *New Orleans Public Service, Inc. v. United Gas Pipeline Co.*, 694 F.2d 421 (5th Cir.1982) ("*NOPSI II*").[13] The case before us resembles the case we perceived in *NOPSI I*, and *NOPSI I* mandates that the LPSC may intervene as of right. *Accord Mississippi Power & Light Co. v. United Gas Pipeline Co.*, 621 F.Supp. 718 (S.D.Miss.1985) (ordering intervention as of right under facts similar to *NOPSI I*); *cf. NOPSI I*, 690 F.2d at 1216–17 (Garwood, J., concurring) (expressing "serious doubts" that the regulatory agency has an "interest" in the litigation).

In the alternative, we would hold that the district court abused its discretion by denying permissive intervention under Rule 24(b), especially because neither GSU nor Southern opposed the LPSC's intervention or claimed that it would prejudice their rights or delay the litigation. *See NOPSI I*, 690 F.2d at 1209–10.[14]

---

**13.** This holding of *NOPSI II* was affirmed by our court sitting en banc. *See New Orleans Public Service, Inc. v. United Gas Pipeline Co.*, 732 F.2d 452 (5th Cir.) (en banc) ("*NOPSI III*"), cert. denied, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). The power to regulate NOSPI is governed by La. Const. art. 4 § 21(C), which provides:

[The LPSC] shall have no power to regulate any ... public utility owned, operated, or regulated by the governing authority of [a] political subdivision[ ], except by the approval of a majority of the electors voting in an election held for that purpose; however, a political subdivision may reinvest itself with such regulatory power in the manner in which it was surrendered.

On November 28, 1981, New Orleans voted to transfer its authority over NOPSI to the LPSC, effective January 1, 1982. *See NOPSI III*, 732 F.2d at 461 n. 19. On May 4, 1985, the city reversed itself and voted to regain the regulatory power it had forfeited.

**14.** In *NOPSI III*, the *en banc* court reversed *NOPSI I*'s holding regarding Rule 24(b), noting: "Whatever the strength of [ *NOPSI I*] in the context of the assumptions [that the city officials had authority to regulate NOPSI, it is] wholly inapplicable in view of the transfer of all the city's ... regulatory authority to the [LPSC]." 732 F.2d at 472. Thus, *NOPSI III* governs intervention by *non-regulators* and is inapposite to the case before us.

### VI. Conclusion

We affirm the district court's exercise of subject matter jurisdiction subject to the limits discussed above. The district court may address GSU's claims that Southern failed to renegotiate in good faith, that the UPS and Interchange contracts were induced by fraud, that Southern is selling more than its available Long Term Power under Schedule E, and that the *quantity* of electricity GSU must take under its contracts excuses its performance under state contract law. As the litigation proceeds and GSU's theories become clearer, however, the district court may find that the FERC has exclusive or primary jurisdiction over some of GSU's claims.

Until the district court decides the merits of this case, it may within its discretion accept deposits under Rule 67 from GSU. Finally, the motion of the LPSC to intervene should be, and is, granted.

The decision of the district court is

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.