Alfred BRANCO; Edward Branco; Steven Branco, Plaintiffs–Appellants,

v.

UFCW–NORTHERN CALIFORNIA EMPLOYERS JOINT PENSION PLAN, Defendant–Appellee.

No. 00–15884.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 2001.

Filed Feb. 11, 2002.

John A. DeRonde, Jr., Fairfield, California, for the plaintiff-appellant.

J. Thomas Bowen and Florence E. Culp, Davis, Cowell & Bowe, LLP, San Francisco, California, for the defendant-appellee.

Before: PREGERSON and RAWLINSON, Circuit Judges, and CHARLES WEINER,* Senior District Judge.

Opinion by Judge RAWLINSON; Dissent by Judge PREGERSON.

## OPINION

RAWLINSON, Circuit Judge.

This case sits at the intersection of the Employee Retirement Income Security

---

* The Honorable Charles Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Act ("ERISA") and California's community property statutes. We must decide whether ERISA preempts a state law which allows a predeceased spouse's interest in her ex-husband's pension plan to pass to her heirs. In this case of first impression, we hold that state law must yield. Accordingly, we REVERSE and REMAND.

## BACKGROUND

Alfred Branco ("Branco"), is a participant in the UFCW–Northern California Employers Joint Pension Plan (the "Plan"). On July 1, 1998, Branco was eligible for retirement benefits in the amount of $594.17 per month. Branco and his former wife, Anna Branco ("Anna"), had previously stipulated to a court order granting Anna a 47.07% community property interest in Branco's pension benefits. The order required payments to continue "for so long as they were payable to or on behalf of [Branco]." Anna died before any pension payments were payable to Branco. Anna was survived by Steven and Edward Branco ("Steven and Edward"), her two adult sons.

Based upon its interpretation of the court order and applicable law, the Plan paid Branco the sum of $314.49 per month in pension benefits, after deducting Anna's community property interest as awarded in the court order.

Branco filed his original complaint against the Plan in state court alleging breach of contract, seeking payment of the entire benefit amount without deduction. The Plan removed the action to federal court, resulting in dismissal of Branco's complaint with leave to amend, on the basis that the state law claims were preempted by ERISA. Branco amended his complaint to include ERISA claims. Subsequently, the parties stipulated to certain facts and filed cross-motions for summary judgment. The district court denied both Motions for Summary Judgment, but gave Branco thirty days to produce evidence that the proper plaintiff to the action had assigned Branco his or her interest in Anna's share of Branco's pension. In response, Branco submitted two notarized assignments from Steven and Edward, assigning to Branco their purported interests (alleged to have passed to them through intestacy) in Anna's share of Branco's pension, and any legal causes of action associated therewith. On April 12, 2000, the district court denied Branco's Motion for Summary Judgment and granted the Plan's Cross Motion for Summary Judgment because Branco failed to submit any evidence to support his claim that Anna's interest in his pension passed to Edward and Steven upon her death. On May 9, 2000, Branco filed a timely Notice of Appeal. On the same day, Branco filed a Second Notice of Motion to Amend or Alter Judgment. The district court considered Branco's Motion and requested further briefing and evidence, thereby giving Branco an additional opportunity to submit competent evidence that Edward and Steven properly acquired Anna's interest in the pension benefits. On June 12, 2000, Branco filed Supplemental Points & Authorities reiterating his original claim that Anna's share of his benefits should revert to him upon Anna's death. In the alternative, Branco asked the court to allow him to proceed with his appeal. On June 20, 2000, the district court granted Branco's alternative request to proceed with his appeal, interpreting the request as a motion to withdraw his second motion to alter or amend the judgment.

## DISCUSSION

I. Standard of Review

■ A grant of summary judgment is reviewed de novo. *Delta Savings Bank v. United States*, 265 F.3d 1017, 1021(9th Cir. 2001). "[Our] review is governed by the same standard used by the trial court un-

der Federal Rule of Civil Procedure 56(c). [We] must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* (citation omitted).

## II. ERISA Preemption

■■■ The preemption doctrine, which has its roots in the Supremacy Clause, U.S. Const., Art. VI, cl. 2, requires us to examine Congressional intent. Preemption may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604, (1977) (citation omitted). ERISA's express preemption clause states that the Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). However, like the Supreme Court in *Boggs v. Boggs,* "[w]e can begin, and in this case end, the analysis by simply asking if state law conflicts with the provisions of ERISA or operates to frustrate its objects." 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997).

## III. Analysis

■■■ In reaching its decision, the district court concluded that California's community property law was not preempted because it did "not operate to deprive Plaintiff, or any other ERISA participant or beneficiary, of benefits to which he would otherwise be entitled" because Branco was already "deprived of that interest" under the court order. According-

ly, the district court narrowed the issue to whether the Plan or Anna's estate is entitled to the benefits. Having to decide between these two potential recipients, the court concluded that permitting Anna to devise her interest in Branco's pension benefits would not frustrate ERISA's purpose to protect plan participants and beneficiaries. The court went on to note that its ruling would protect the community property interest conferred upon Anna by the court order, while also requiring the Plan to meet its obligation to pay out the total amount of earned benefits. Accordingly, the district court decided that Anna's estate was entitled to the benefits, and rendered a tentative ruling in favor of Branco if he could show that he was properly assigned those benefits from the beneficiaries of Anna's estate.[1] In reaching its decision, the district court distinguished *Boggs v. Boggs,* 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45, and *Ablamis v. Roper,* 937 F.2d 1450 (9th Cir.1991), on the grounds that the present case involves a divorced spouse who predeceased the plan participant, whereas those cases involved only a predeceased spouse.

Contrary to the district court's ruling, we are of the view that the reasoning of *Boggs* and *Ablamis* and their applications of ERISA persuasively inform our analysis.

■■■ ERISA dictates that "[e]ach pension shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). The limited exception to this anti-alienation provision is a pension benefit conferred through a Qualified Domestic Relations Order ("QDRO"). 29 U.S.C. § 1056(d)(3)(A).[2] Unless the court order

---

1. The district court subsequently ruled that Branco failed to offer credible evidence on this claim, and granted summary judgment to the Plan. Branco argues. that he did offer sufficient proof on this claim. This issue need

not be resolved given our decision that the district court failed to apply the correct substantive law.

2. QDRO is defined in section 1056 as follows:

between Branco and Anna meets the requirements of a QDRO, Anna's pension interests are subject to the anti-alienation provision, and cannot pass to her intestate heirs. Whether the order "constitutes a valid QDRO under ERISA is a question of law for this court to determine de novo." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1150 n. 5 (9th Cir.2000).

In reaching its decision, the district court assumed, without analysis, that the state court order was a QDRO. However, in order to qualify as a QDRO, a Domestic Relations Order (DRO) must "relate[] to the provision of child support, alimony payments, or *marital property rights to a spouse, former spouse,* child, or other dependent of a participant...." 29 U.S.C. § 1056(d)(3)(B)(ii)(I).

Payments to Anna as a deceased spouse are not authorized under ERISA's definition of a qualifying recipient because, at that point, the QDRO does not relate to marital property rights of a spouse or former spouse. Despite the district court's ruling to the contrary, *Ablamis* is directly applicable on this point. In *Ablamis*, we held that the death of the spouse "divests her of the title of 'spouse or other dependent,' " thereby rendering her an unqualified recipient under ERISA. *Ablamis* at 1456. When Anna died she was divested of her qualified status under ERISA. The fact that Anna was divorced from Branco before she died does not alter the analysis. If the term "spouse" does not include a deceased spouse, the term "former spouse" does not include a deceased former spouse. *Id.*[3]

Anna's estate and/or heirs are similarly precluded as qualified beneficiaries. ERISA permits payment of pension benefits to a third party only if that individual falls within ERISA's statutory definitions of "beneficiary" or "alternate payee." 29 U.S.C. §§ 1002(8), 1056(d)(3)(J),(K). Anna's estate and heirs do not fall within these statutory definitions.[4] *See Ablamis*, at 1456 ("An estate, even of a deceased spouse, certainly does not fall within even the most liberal construction of the phrase 'spouse, former spouse, child or other dependent of the participant.' "). Nor were these alternate payees specifically listed in the DRO, as ERISA requires. *See* 29 U.S.C. § 1056(d)(3)(C)(i) ("A domestic relations order meets the requirements of this subparagraph only if such order *clearly specifies*—... the name and mailing

---

(i) the term "qualified domestic relations order" means a domestic relations order—
(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, ...
(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—
(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and
(II) is made pursuant to a State domestic relations law (including a community property law).
29 U.S.C. § 1056(d)(3)(B)(i),(ii).

3. In *Ablamis*, we noted that "[i]n legal parlance, however, the term 'former spouse' does not include a deceased spouse." *Id.*

4. 29 U.S.C. § 1002(8) defines beneficiary as "a person designated by a participant, or by the terms of any employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1056(d)(3)(K) defines "alternate payee" as "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." While Steven and Edward may be Anna's intestate heirs, it does not appear that they would fit under the definition of alternate payee, since they are not children or dependents.

address of each alternate payee covered by the order....").

An extension of payments to Anna's estate or heirs is akin to the disapproved probate transfer at issue in *Ablamis.* "ERISA's express statutory language and legislative history make it clear that Congress did not intend to classify state court orders effecting Testamentary transfers as QDROs." *Ablamis* at 1455; *see also Boggs* at 852, 117 S.Ct. 1754 (noting that it would be "inimical to ERISA's purposes to permit testamentary recipients to acquire a competing interest in undistributed pension benefits").

■ We recognized in *Ablamis* that "Congress' fundamental purpose was evident throughout—to ensure that both spouses would receive sufficient funds to afford them security during their lifetimes, not to arrange for an opportunity for a predeceasing non-employee spouse to leave a part of her surviving husband's pension rights to others." *Ablamis,* 937 at 1457. Similarly, in *Boggs* the Supreme Court ruled:

> The QDRO provisions, as well as the surviving spouse annuity provisions, reinforce the conclusion that ERISA is concerned with providing for the living. The QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have had available during retirement as a means of income. In the case of a predeceased spouse, this concern is not implicated. The fairness of the distinction might be debated, but Congress has decided to favor the living over the dead and we must respect its policy.

*Boggs* at 854, 117 S.Ct. 1754. Given ERISA's concern for the living, it is consistent to conclude that the QDRO exception to ERISA's anti-alienation provision was not intended to subject significant portions of pension benefits to transfer by a predeceased spouse.

In *Egelhoff v. Egelhoff,* 532 U.S. 141, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001), the Supreme Court held that a Washington statute providing for automatic revocation, upon divorce, of any designation of one's spouse as the beneficiary of nonprobate assets was pre-empted, as it applied to ERISA benefit plans, because of a direct conflict with ERISA's requirement that plans be administered, and benefits be paid, in accordance with plan documents. The Court reached its decision by reasoning that the Plan should not be required to "pay the benefits to the beneficiaries chosen by state law, rather than those identified in the plan documents." *Id.* at 1327. The court further reasoned that "[r]equiring ERISA administrators to master the relevant laws of 50 states and to contend with litigation would undermine the congressional goal of 'minimiz[ing] the administrative and financial burden[s]' on plan administrators—burdens ultimately borne by the beneficiaries." *Id.* at 1329 (citation omitted).

The Supreme Court's concerns in *Egelhoff* apply equally to the present case. Acceptance of the district court's ruling would impermissibly require the Plan Administrators to master California's probate law; to pay benefits to the beneficiaries chosen by state law (California's intestate scheme); and/or to await the conclusion of probate litigation to establish Anna's lawful heirs. Such eventualities clearly contravene *Egelhoff's* holding.

Because there is no QDRO in effect, *Egelhoff* directs us to section 8.04 of the Plan, which provides: "Benefits are payable ... to Participants...." As the Plan Participant, Branco is entitled to payment of the entire benefit, without reduction.

## CONCLUSION

Because the state court order was not a QDRO, it impermissibly alienated Branco's pension benefits to Anna as a deceased former spouse. The language of the court order requiring payments to continue "for as long as they are payable to or on behalf of [Branco]," conflicts with ERISA's anti-alienation provision and is therefore preempted. Accordingly, the district court erred in entering judgment on behalf of the Plan, and denying Branco's motion for summary judgment.

Because we have ruled in Branco's favor on the assignment issue, his remaining claims need not be addressed.

REVERSED and REMANDED for entry of judgment in favor of Branco.

PREGERSON, Circuit Judge, Dissenting.

The majority reaches its holding by relying on our decision in *Ablamis v. Roper*, 937 F.2d 1450 (9th Cir.1991), and two recent Supreme Court decisions, *Boggs v. Boggs*, 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) and *Egelhoff v. Egelhoff*, 532 U.S. 141, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). The District Court, however, already properly distinguished *Ablamis* and *Boggs*, and *Egelhoff* is likewise distinguishable.

In each of these three cases, a plan participant or beneficiary, upon the death of their spouse, suddenly saw their interest in benefits they expected at that time divested and defeated by state law. *Ablamis*, 937 F.2d at 1452; *Boggs*, 520 U.S. at 836–37, 117 S.Ct. 1754; *Egelhoff*, 121 S.Ct. at 1325–26. The circumstances in the present case are different. Neither when Anna died nor at any later point in time did California state law suddenly divest Alfred of any benefits he expected at that time. On the contrary, Alfred had long ago given up any expectation in these benefits when he stipulated to the divorce settlement order explicitly granting Anna 47.07% of the benefits "for as long as they are payable to or on behalf of" Alfred. Under these circumstances, the majority's holding not only does not advance the purpose of ERISA's anti-alienation clause to "guarantee that retirement funds are there when a plan's participants and beneficiaries expect them." *Boggs*, 520 U.S. at 852, 117 S.Ct. 1754. The majority's holding also undermines community property law's "commitment to the equality of husband and wife and ... the real partnership inherent in the marital relationship." *Id.* at 840, 117 S.Ct. 1754.

I respectfully dissent.