**TRANSMISSION AGENCY OF NORTHERN CALIFORNIA, Plaintiff–Appellant,**

v.

**SIERRA PACIFIC POWER COMPANY, Bonneville Power Administration, Pacificorp, and Portland General Electric, Defendants–Appellees.**

No. 01–15449.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 11, 2002.

Filed April 16, 2002.

Amended July 8, 2002.

Dennis L. Viglione, Montague, Cochrane & Viglione, Sacramento, CA, for the plaintiff-appellant.

Bruce G. Forrest, Department of Justice, Washington, D.C., John A. Sturgeon, White & Case LLP, Los Angeles, CA, and David S. Aman, Tonkon Torp LLP, Portland, OR, for the defendants-appellees.

Before DAVID R. THOMPSON, W. FLETCHER, and BERZON, Circuit Judges.

## ORDER

DAVID R. THOMPSON, Circuit Judge.

The opinion filed April 16, 2002 is amended as follows:

At slip opinion page 5765, in the first full paragraph, the fourth sentence that begins "TANC cannot obtain state law money damages ..." is amended to read: "TANC cannot obtain state law money damages allegedly resulting from the operation of an interstate electricity intertie expressly approved by FERC, where the manner of operation was necessarily contemplated at the time of approval."

At slip opinion page 5766, in the first full paragraph, the fifth sentence that begins "Offering an analogy of our own ..." is amended to read: "Offering an analogy of our own, allowing TANC to sue under state law for damage allegedly caused to its transmission system by an interconnected interstate system approved by FERC would be akin to allowing an airline to sue under state law for economic damages caused by another airline's FAA-approved flight plans."

With these amendments, the panel named above has voted to deny the petition for rehearing. Judges W. Fletcher and Berzon have voted to deny the petition for rehearing en banc, and Judge Thompson has recommended denial of that petition.

The full court has been advised of the petition for rehearing en banc, and no judge has requested a vote on that petition.

The petition for rehearing and petition for rehearing en banc are DENIED.

## OPINION

The Transmission Agency of Northern California (TANC) is a joint exercise of powers agency composed of over a dozen Northern and Central California municipalities. It brought suit against the Bonneville Power Administration (BPA), a federal power marketing agency of the United States Department of Energy,[1] and the defendant regional utility companies. TANC asserted claims for equitable relief and damages allegedly incurred as a result of the BPA and the other defendants constructing, and interconnecting with, an electricity intertie known as the Alturas Intertie.

The district court did not reach the merits of TANC's claims. It dismissed the claims against the BPA for lack of subject matter jurisdiction, concluding that those claims challenged final agency action by the BPA and fell within the Ninth Circuit

---

1. The BPA markets power from federal and nonfederal hydroelectric projects, with a primary service area that includes California, Oregon, and Nevada. The BPA's transmission lines constitute approximately 80% of the Pacific Northwest's bulk transmission capacity.

Court of Appeals' exclusive original jurisdiction. *See* 16 U.S.C. § 839f(e)(5). It also dismissed, as preempted under the Federal Power Act, 16 U.S.C. §§ 791–828c, TANC's claims against the defendant utility companies. TANC appeals. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I

### Facts and Proceedings

Because this case comes before us on appeal from a dismissal under Federal Rule of Civil Procedure 12(b)(6), all facts alleged in TANC's complaint are taken as true and construed in the light most favorable to it. *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996).

TANC alleged that in 1991 it entered into an "Interim Interconnection Agreement" and "Schedule and Coordination Agreement" (collectively the "Agreements") with the defendants BPA, Portland General Electric, and PacifiCorp (collectively the "Northwest Parties") to jointly construct and operate an interconnection of two electricity interties. Under the Agreements, the Northwest Parties agreed to upgrade from 3200 MW to 4800 MW an existing intertie that they own in Oregon, known as the Northwest AC Intertie. TANC, in turn, agreed to construct a new 1600 MW line known as the California–Oregon Transmission Project. TANC also agreed to connect the California–Oregon Transmission Project to an already existing intertie in California, the 3200 MW Pacific AC Intertie,[2] to form the 4800 MW California–Oregon Intertie. Finally, TANC and the Northwest Parties agreed to join the California–Oregon Intertie with the Northwest AC Intertie, creating a transfer capability of 4800 MW north-to-south at the California–Oregon Border between the two interties. The parties performed under the Agreements, and the Federal Energy Regulatory Commission (FERC) allocated to TANC's California–Oregon Transmission Project one-third of the newly-created transfer capability.

In 1996, the BPA announced its decision to join the Northwest AC Intertie with the new 300 MW Alturas Intertie, which was to be constructed by defendant Sierra Pacific. *See* Decision to Interconnect with Sierra Pacific Power Company's Alturas Transmission Line Project, 61 Fed.Reg. 7095 (Feb. 26, 1996). Sierra Pacific completed construction of the Alturas Intertie in late 1998.

The Alturas Intertie stretches from Nevada through northern California and into Oregon, where it connects with the Northwest AC Intertie. When operational, the Alturas Intertie causes a megawatt-for-megawatt reduction in the ability of the Northwest AC Intertie to deliver power to the California–Oregon Intertie. As a result, if the Alturas Intertie is operating at its maximum 300 MW capacity, then the California–Oregon Intertie has 300 MW of excess capacity.

Prior to the Alturas Intertie commencing operations, TANC (and other companies and instrumentalities not parties to this litigation) filed an unsuccessful protest with FERC, alleging that the Alturas Intertie would create a megawatt-for-megawatt reduction in the capacity of the California–Oregon Intertie. In that proceeding, TANC requested that FERC ensure that procedures were put in place to protect the "then existing" contractual relationships, including the California–Ore-

---

**2.** The Pacific AC Intertie is located south of the California–Oregon border and is owned by utilities not parties to this litigation. It was already connected to the Northwest AC Intertie, but that connection provided only 3200 MW of transfer capability.

gon Intertie's alleged first-priority access to 4800 MW of transfer capability under the Agreements. Alternatively, TANC asked FERC to delay operation of the Alturas Intertie until either Congress approved the intertie, or the Northwest AC Intertie's capacity was increased to 5100 MW. FERC denied these requests and, on November 30, 1998, it approved operation of the Alturas Intertie. *See* 85 F.E.R.C. ¶ 61,314 (Nov. 30, 1998).

In February 1999, however, after operation of the Alturas Intertie had commenced, FERC initiated a hearing into the connection agreement creating the Alturas Intertie. FERC considered the hearing necessary to address allegations regarding the megawatt-for-megawatt reduction in the California–Oregon Intertie's capacity, the inconsistency between the Alturas scheduling agreement and the California–Oregon Intertie's scheduling needs, and related issues.

■ Before the FERC case was resolved,[3] TANC filed the present lawsuit in December 1999 in California Superior Court against the BPA, Sierra Pacific, Portland General Electric, and PacifiCorp. As amended, TANC's complaint alleged breach of contract, tort, and property claims and requested legal and equitable relief. Specifically, TANC alleged that the reduction in capacity of transfers from the Northwest AC Intertie to the California–Oregon Intertie breached the Agreements and caused damage to the California–Oregon Transmission Project. TANC also asserted a fraud claim, alleging that Sierra Pacific had made misrepresentations before unspecified governmental agencies to obtain approval for the Alturas Intertie.

The BPA, a federal agency, exercised its right to remove the action to federal court, *see* 28 U.S.C. §§ 1442(a)(1), 1446(a), and the remaining defendants followed suit, asserting federal question and diversity jurisdiction. *See* 28 U.S.C. §§ 1331, 1332. Once in federal court, the defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 19(b). TANC then voluntarily dismissed its tort claims against the BPA and its claims for equitable relief. The district court dismissed the remainder of TANC's claims under Rules 12(b)(1) and 12(b)(6). The court held that the claims against the BPA were subject to the exclusive original jurisdiction of this court under 16 U.S.C. § 839f(e)(5), and that TANC's claims against Sierra Pacific, PacifiCorp, and Portland General Electric were preempted by the Federal Power Act. This appeal followed.

## II

### Claims Against BPA

TANC raises two challenges to the district court's dismissal of its claims against the BPA. TANC contends that (1) the district court erred in holding that its claims were challenges to final agency action by the BPA and thus within the exclusive original jurisdiction of the Ninth Circuit Court of Appeals, and (2) even if the district court was correct that it lacked

---

**3.** After the district court filed its opinion in this case, an administrative law judge released a decision in the ongoing FERC proceeding that is reported at *Sierra Pacific Power Co.*, 94 F.E.R.C. 63,019 (2001). Although that decision is still subject to further administrative and judicial review, and therefore not finally dispositive of any issue in the case, the existence of the ongoing litigation within

FERC is an adjudicative fact relevant to this case. Federal Rules of Evidence 201(a), (b). Further, the existence of the opinion is not in dispute, nor are its contents. *Id.* Therefore, we take judicial notice of the entirety of 94 F.E.R.C. 63,019. See Fed.R.Evid. 201(c). This renders moot the parties' pending motions requesting that we take judicial notice of only select portions of that decision.

jurisdiction, instead of dismissing the claims, it should have transferred them under 28 U.S.C. § 1631 from the district court to this court or, alternatively, to the Court of Federal Claims. We are unpersuaded by TANC's arguments, and affirm the decision of the district court.

## A

■ The district court ruled that it lacked subject matter jurisdiction over TANC's claims against the BPA because those claims were challenges to final agency action by the BPA over which this court has exclusive original jurisdiction under section 9(e)(5) of the Northwest Power Planning Act, codified at 16 U.S.C. § 839f(e)(5). We review de novo the district court's conclusion that it lacks subject matter jurisdiction. *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 396 (9th Cir.1996).

■ Section 9(e)(5) of the Northwest Power Planning Act provides:

> Suits to challenge ... final actions and decisions taken pursuant to this Act by the [Bonneville Power] Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this Act [or] the Bonneville Project Act ... shall be filed in the United States court of appeals for the region. [Once the time for such challenges has passed,] [t]he plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this Act or any other law. Suits challenging any other actions under this Act shall be filed in the appropriate court.

TANC's remaining claims against the BPA are for breach of contract and inverse condemnation. TANC argues that these claims do not fall within this court's exclusive original jurisdiction because the claims are not challenges to any final ad-

ministrative decision—an argument made with particular reference to the district court's decision that the claims against the BPA were ultimately challenges to the BPA's decision to join in the construction and operation of the Alturas Intertie. Rather, TANC argues, its claims fall under the final sentence of section 9(e)(5) quoted above, establishing jurisdiction over any other claims in the appropriate court. We disagree.

■ "We have consistently interpreted [the section 9(e)(5)] judicial review provision 'with a broad view of this Court's jurisdiction and a narrow definition of district court jurisdiction.'" *Cent. Mont. Elec. Power Coop., Inc. v. Adm'r*, 840 F.2d 1472, 1475 (9th Cir.1988) (quoting *Pacific Power and Light v. Bonneville Power Admin.*, 795 F.2d 810, 814 (9th Cir.1986)). In evaluating whether jurisdiction exists under section 9(e)(5), TANC's particular legal theories of breach of contract and inverse condemnation are not controlling. "It matters not that the [plaintiffs] attempt to base their theory of recovery in part outside of the Northwest Power Planning Act. In examining the nature of the agency action being challenged, our focus is 'on the agency being attacked and whether the factual basis for the attack is an agency action authorized by the Act.'" *Cent. Mont. Elec. Power*, 840 F.2d at 1476 (quoting *Pacific Power*, 795 F.2d at 816); *accord Forelaws on Bd. v. Johnson*, 709 F.2d 1310, 1313 (9th Cir.1983).

In *Pacific Power*, we held that we had exclusive jurisdiction where declaratory relief against proposed agency ratemaking was sought, even though the plaintiffs argued that they sought to challenge only the fact that the BPA's new rates breached prior contractual commitments. *Pacific Power*, 795 F.2d at 815. We explained that "[a]lthough the utilities' action is

based upon their contracts with BPA, the effect of their action would be to challenge BPA's ratemaking proceedings and the agency's obligation to undertake ratemaking in a manner consistent with its contractual commitments." *Id.* at 815–16.

Similarly, in *Central Montana Electric Power*, we rejected the argument of the plaintiff electrical cooperatives that we lacked exclusive original jurisdiction over a claim to a share of electric power because a portion of that claim rested on law and facts outside of the Northwest Power Planning Act. We explained that ultimately, "[t]he nature of the agency action being challenged by the Cooperatives [was] the Administrator's final action as to the marketing and allocation of electric power, a function that is governed extensively by the Northwest Power Planning Act.... Accordingly, the action is subject to our exclusive jurisdiction...." *Cent. Mont. Elec. Power*, 840 F.2d at 1476 (citations omitted).

TANC's basic argument is that it is only challenging the BPA's failure to maintain 4800 MW of transfer capability between the Northwest AC Intertie and the California–Oregon Intertie. TANC contends this deprived it of electricity capacity for the California–Oregon Transmission Project[4] and violated the Agreements. TANC argues that it is irrelevant whether construction of the Alturas Intertie contributed to the deprivation and breach, because the BPA could have chosen to increase the overall capacity of the Northwest AC Intertie to 5100 MW and did not.

TANC relies upon *Public Utility District Number 1 v. Johnson*, 855 F.2d 647 (9th Cir.1988). There, the petitioner challenged several BPA actions, but it also alleged a breach of contract claim based upon an oral contract it entered into with the BPA. We held that we lacked original jurisdiction over the breach of contract claim because "claims involving alleged contractual breaches by the agency and based on allegations of facts outside an administrative record must be heard in the claims court...." *Id.* at 650. We distinguished previous breach of contract cases that reached a contrary result because in those cases the claims ultimately challenged final agency action by the BPA pursuant to its statutory authority. *Id.* at 649–50 (distinguishing *Pacific Power*, 795 F.2d. at 816). We explained: "In this case, however, the principal conduct of the agency on which petitioner's claim is based *is not final action taken pursuant to statutory authority*; it is alleged contractual commitments made outside the scope of any administrative record, and which petitioners contend have been breached." *Public Utility District Number 1*, 855 F.2d at 650 (emphasis added). Original jurisdiction over that case, therefore, lay in the claims court. *Id.* at 650–51.

■ Unlike the petitioner's claim in *Public Utility District Number 1*, TANC's inverse condemnation and breach of contract claims cannot be separated out from the BPA's final administrative decision.[5] In

---

4. We assume, without deciding, that a deprivation of electricity might support a claim for inverse condemnation under California law. Cf. *Harding v. State of Cal. ex rel. Dept. of Transp.*, 159 Cal.App.3d 359, 364–67, 205 Cal. Rptr. 561 (1984) (holding that a deprivation of light can support an inverse condemnation claim).

5. The parties devote much discussion to the administrative record component of the Public Utility District Number 1 decision, as opposed to our holding that the oral contract claim was not a challenge to any final administrative decision. This is a plausible reading of Public Utility District Number 1, but not an accurate one. The key test under section 9(e)(5) is whether there is a challenge to a final administrative decision or its implemen-

deciding to join the Northwest AC Intertie with the Alturas Intertie without also making provision to increase the capacity of the Northwest AC Intertie, the BPA plainly decided to take an action that would deprive TANC of transmission capacity and that was inconsistent with the BPA's alleged contractual commitments to TANC. At that time, TANC could have filed a petition in this court under section 9(e)(5) to challenge the BPA's decision on these grounds. TANC did not file such a petition. It cannot raise the issue at this late date by clothing its challenge in state law claims. The root cause of the alleged inverse condemnation and breach of contract was the BPA's decision to join the Northwest AC Intertie to the Alturas Intertie, a final decision under section 9(e)(5) of the Northwest Power Planning Act. We alone have original jurisdiction over a challenge to that decision. *Cf. Pacific Power*, 795 F.2d at 815–16.

### B

TANC requests that if we hold that the district court lacked jurisdiction over its claims against the BPA, we transfer those claims to this court. Under 28 U.S.C. § 1631, a federal court may transfer an action over which it lacks jurisdiction to another court that has jurisdiction. The district court denied this request, and so do we.

A transfer under § 1631 is inappropriate if the action would have been

tation, not the existence or adequacy of an administrative record. See *Cent. Mont. Elec. Power*, 840 F.2d at 1476; see also *Puget Sound Energy, Inc. v. United States*, 47 Fed. Cl. 506, 512 (Claims Ct.2000). This is especially true where, as here, the asserted inadequacy of an administrative record regarding a key issue was caused by the plaintiff's failure to raise that issue in response to an administrative decision that clearly implicated the issue.

untimely had it been filed in the appropriate court. *Abbott v. United States*, 144 F.3d 1, 6 (1st Cir.1998). Section 9(e)(5) of the Northwest Power Planning Act requires that suits challenging a final BPA action, or its implementation, be filed within ninety days of the BPA giving notice of the action in the Federal Register or of the action becoming final. 16 U.S.C. § 839f(e)(5). Here, the BPA announced its decision to interconnect the Northwest AC Intertie to the Alturas Intertie in February 1996. TANC's complaint was not filed until December 1999. Therefore, TANC's action challenging the BPA's final decision is untimely and transfer to this court is precluded. The district court correctly dismissed TANC's claims against the BPA for lack of subject matter jurisdiction.[6]

### III

#### Claims Against The Utility Company Defendants

TANC also appeals the district court's dismissal, under Federal Rule of Civil Procedure 12(b)(6), of TANC's claims against the utility company defendants, Sierra Pacific, Pacific Corp, and Portland General Electric. The district court held that these claims were preempted by the Federal Power Act, 16 U.S.C. §§ 791–828c. "We review de novo both a dismissal for failure to state a claim under Rule 12(b)(6) and the district court's decision regarding preemption." *Nathan Kimmel,*

6. Alternatively, TANC asks us to transfer this case to the Court of Federal Claims. Although it is true that court has jurisdiction over non-tort suits against the BPA, see 28 U.S.C. §§ 1346(a)(2), 1491, that jurisdiction only exists where we lack exclusive jurisdiction under section 9(e)(5). Public Utility District Number 1, 855 F.2d at 650.

*Inc. v. DowElanco,* 275 F.3d 1199, 1203 (9th Cir.2002) (citing *Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.), *cert. denied* 531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000)).

■ Federal preemption of state law is rooted in the Supremacy Clause, Article VI, clause 2, of the United States Constitution. Preemption of state law "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), *quoted in Branco v. UFCW–Northern Cal. Employers Joint Pension Plan,* 279 F.3d 1154, 1157 (9th Cir.2002).

TANC asserts three categories of state law claims against the utility company defendants: (1) tort and property claims for inverse condemnation, nuisance, trespass, and conversion; (2) claims for breach of contract, intentional interference with a contractual relationship, and intentional interference with a prospective economic advantage; and (3) a fraud claim solely against Sierra Pacific. All of these claims are preempted by the Federal Power Act.

### A

■ The conflict between federal law and TANC's state law tort and property claims is readily apparent. As the Supreme Court has explained, Part II of the Federal Power Act, codified at 16 U.S.C. §§ 824–824m, delegates to the Federal Energy Commission *"exclusive* authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce," *New England Power Co. v. New Hampshire,* 455 U.S. 331, 340, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982) (empha-

sis added). Thus, as we have recently explained, "FERC's exclusive jurisdiction extends over all facilities for such transmission or sale of electric energy." *Duke Energy Trading & Mktg., L.L.C. v. Davis,* 267 F.3d 1042, 1056 (9th Cir.2001) (citing 16 U.S.C. § 824(b), (d)); *see also Ass'n of Pub. Agency Customers v. Bonneville Power Admin.,* 126 F.3d 1158, 1173 (9th Cir.1997) ("Interstate transmission [of electricity] is clearly a federal matter.").

■ All of TANC's tort and property claims allege that the operation of the Alturas Intertie either damages, or trespasses on, the California–Oregon Transmission Project. FERC, however, approved the operation of the Alturas Intertie and its connection to the Northwest AC Intertie, thereby creating an interstate system for the transmission of electricity that stretches from Oregon through northern California and into Nevada. FERC alone has the authority to modify its decision pertaining to the Alturas Intertie, or to respond to challenges to the Intertie's operation. TANC cannot obtain state law money damages allegedly resulting from the operation of an interstate electricity intertie expressly approved by FERC, where the manner of operation was necessarily contemplated at the time of approval. *Cf. Midwestern Gas Transmission Co. v. McCarty,* 270 F.3d 536, 539–40 (7th Cir.2001) (holding that a state commission may not interfere with an interconnection of interstate gas transmission lines once that interconnection has been approved by FERC).[7]

Unable to cite any case involving the interstate transmission of electricity (or a like commodity) where state law tort or

---

**7.** Decisions under the Natural Gas Act and Federal Power Act are interchangeable. See *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 7, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981).

property claims challenging that transmission have been allowed to go forward notwithstanding federal approval of the transmission, TANC relies upon a string of airport cases where federal approval of flight plans did not preempt state law nuisance and noise violation claims. TANC then suggests the analogy that a homeowner would be equally free to file a state law nuisance claim regarding the operation of power lines, and that TANC is in a position akin to that of such a homeowner. This analogy relies upon a number of false premises, but we need only point out the most obvious one.

We may assume for the purpose of argument that a homeowner, in certain circumstances, might be able to pursue a state law tort or inverse condemnation claim challenging the operation of electricity transmission lines, in much the same way a homeowner might pursue a claim challenging airport noise. This does not mean, however, that TANC can do the same. TANC is not a homeowner. It is an operator of an interconnected, federally regulated, interstate transmission system. *See generally New York v. FERC*, —— U.S. ——, 122 S.Ct. 1012, 1017, 152 L.Ed.2d 47 (2002) (describing the highly interconnected nature of the nation's electricity grids, including on the West Coast). Offering an analogy of our own, allowing TANC to sue under state law for damage allegedly caused to its transmission system by an interconnected interstate system approved by FERC would be akin to allowing an airline to sue under state law for economic damages caused by another airline's FAA-approved flight plans. Not surprisingly, no aviation case nor any other authority supports such a proposition.

More to the point, what TANC seeks to achieve by its tort and property claims would defeat the entire purpose of exclusive federal regulation of interstate transmission of electricity. FERC has approved the construction and operation of the Alturas Intertie, and FERC alone (subject to court review of its final decision) can modify that decision, or deal with any party who operates the Alturas Intertie improperly. We conclude that TANC's state law tort and property claims against the utility company defendants are preempted. We next consider TANC's contract-related claims against these defendants.

B

All of TANC's contract-related claims depend upon the assumption that, but for the misdeeds of the utility company defendants, FERC would have continued to allocate 4800 MW of electricity transmission capacity from the Northwest AC Intertie to the California–Oregon Intertie. This speculative assumption as to how FERC would have allocated electricity transmission capacity runs afoul of the filed rate doctrine.

At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question. *County of Stanislaus v. Pacific Gas & Elec. Co.*, 114 F.3d 858, 862–63 (9th Cir.1997). The doctrine applies to rates charged by railroads, *see Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), natural gas companies, *see Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), and other interstate operators over whom federal agencies have exclusive power to set rates. More relevant here, the Supreme Court has extended the doctrine to the Federal Power Act and to electricity rates.

In *Montana–Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951), the Supreme Court held that a plaintiff in a case involving electricity rates set by the Federal Power Commission (the precursor to FERC) could "claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms." The Court has explained that this rule is without exception: "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction.... This was done in the Power Act by making [Federal Power Commission] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States." *Fed. Power Comm'n v. Southern Cal. Edison Co.*, 376 U.S. 205, 215–16, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964), *quoted in Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).

■ As further developed, the filed rate doctrine has prohibited not just a state court (or a federal court applying state law) from setting a rate different from that chosen by FERC, but also from assuming a hypothetical rate different from that actually set by FERC. In *Arkansas Louisiana Gas Co.*, 453 U.S. at 579, 101 S.Ct. 2925, the Court stated:

> It would undermine the congressional scheme of uniform regulation of rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the [Natural Gas] Act. Following that course would permit state courts to

grant regulated sellers greater relief than they could obtain from the Commission itself.

The Court has also expanded the reach of the filed rate doctrine beyond just rates. In *Nantahala Power*, the Supreme Court held that "the filed rate doctrine is not limited to rates *per se*." 476 U.S. at 966, 106 S.Ct. 2349. Instead, any allocation of power that directly affects rates is protected by the filed rate doctrine. *Id.* at 966–67, 106 S.Ct. 2349. Thus, following *Nantahala Power*, we recognized that an allocation of natural gas approved by the Economic Regulatory Administration (ERA) is covered by the filed rate doctrine, just as if the allocation had been a decision on rates. *See County of Stanislaus*, 114 F.3d at 863–64 ("Plaintiffs' denial of access claims are, at core, a challenge to the quantity of gas that PG & E purchased from Canadian producers; because such quantities had received ERA approval and authorization, the claims cannot overcome the filed rate doctrine's clear instruction that ERA-approved volumes are conclusively reasonable.").

In *County of Stanislaus*, we noted that in *Nantahala* the Court had left open the possibility that a claim based on allocation might not be covered by the filed rate doctrine, if that allocation had not been set or approved by FERC or another federal agency. *County of Stanislaus*, 114 F.3d at 864. However, the reservation of this issue with regard to allocations of interstate electricity transmission capacity is no longer appropriate because FERC's failure to address a specific allocation of electricity no longer invites the possibility that the filed rate doctrine might not apply. We reach this conclusion by giving deference to FERC Order No. 888, reported at 61 Fed.Reg. 21,540 (May 10, 1996).[8]

---

8. In a case deciding several consolidated appeals, the D.C. Circuit upheld FERC Order

FERC Order No. 888 has functionally combined FERC regulation of rates with FERC regulation of transmission capacity. The Order accomplishes this because it regulates rates not by setting them directly, but rather by setting rules requiring open access to transmission lines at uniform, openly disclosed, rates. *See id.* at 21,541; *see also* 18 C.F.R. § 35.28 (implementing the nondiscriminatory open access transmission tariff policy). These open policies as to transmission capacity, FERC expects, will result in rates set at a competitive level. *See* 61 Fed.Reg. at 21,541. Thus, FERC's regulation of interstate rates now operates through FERC's regulation of open access to transmission capacity. For that reason, any right to a particular allocation of interstate transmission capacity must now be considered an exclusive matter of federal law. To conclude otherwise would restrict FERC's ability to regulate rates through its open transmission policy. We therefore hold that FERC's exclusive jurisdiction over the interstate transmission of electricity extends to any claims of entitlement to a specific allocation of interstate transmission capacity, whether that claim asks a court to enforce such an alleged entitlement or merely to hypothetically assume it.[9]

In the present case, the common theme in TANC's claims against the utility company defendants for breach of contract, intentional interference with a contractual relationship, and intentional interference with a prospective economic advantage is the contention that TANC is, or would have been, entitled to 4800 MW of transfer capability between the Northwest AC Intertie and the California–Oregon Intertie. This contention stumbles upon the filed rate doctrine.

For a district or state court to conclude that under state contract law the Northwest Parties breached the Agreements— or that Sierra Pacific interfered with the Agreements or ·the prospective economic advantage related to those Agreements— by failing to increase the capacity of the Northwest AC Intertie to 5100 MW, the court would have to hold that under state contract law TANC was entitled to 4800 MW of transfer capacity. Yet, state law can no more assume how FERC would allocate access to interstate transmission capacity than it can assume how FERC would set rates. *Cf. Arkansas Louisiana Gas Co.,* 453 U.S. at 579, 101 S.Ct. 2925. This is true given both FERC Order No. 888 and FERC's express approval of the operation of the Alturas Intertie, with knowledge that its connection to the Northwest AC Intertie could impair the California–Oregon Intertie and the California–Oregon Transmission Project. Although this resolution may leave TANC's

No. 888; the Supreme Court granted certiorari on two issues not related to this appeal and issued an opinion affirming the D.C. Circuit and upholding FERC Order No. 888. *Transmission Access Policy Study Group v. FERC,* 225 F.3d 667 (D.C.Cir.2000) (per curiam), aff'd. sub. nom. *New York v. FERC,* —— U.S. ——, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002).

9. We have grounded our decision in the filed rate doctrine, despite the existence of separate FERC authority over transmission capacity, because no court has yet determined whether the rule against courts assuming hypothetical allocations of transmission capacity would apply if the hypothetical allocations of transmission capacity did not affect FERC-controlled rates. We note, however, that as the Supreme Court has recently explained, FERC's jurisdiction of electricity transmission, unlike its jurisdiction over sales (i.e.rates), can reach intrastate transmissions. *New York v. FERC,* 122 S.Ct. at 1017. Hence, we reserve for future resolution the question whether federal law preempts claims that assume a hypothetical allocation of intrastate transmission capacity, notwithstanding FERC's lack of authority over intrastate sales.

state law claims unredressed, such a circumstance is not an unlikely result of preemption. *Cf. id.* at 584 ("A finding that federal law provides a shield for the challenged conduct will almost always leave the state law violation unredressed.").

This same analysis undercuts TANC's reliance on a Fifth Circuit case, *Gulf States Utilities Co. v. Alabama Power Co.,* 824 F.2d 1465 (5th Cir.1987). There, the court held that claims regarding the quantity of electricity required under a contract were not preempted by the filed rate doctrine. *Id.* at 1472. However, in that case, the quantity to be purchased was not within the ambit of federal regulation. *Id.* In the present case, in light of FERC Order No. 888, the right to interstate transmission capacity access falls squarely within the area of exclusive federal regulation of rates.

We conclude that TANC's breach of contract and related claims against the utility company defendants are preempted by the Federal Power Act, 16 U.S.C. §§ 791–828c.

## C

██ We turn now to TANC's fraud claim against Sierra Pacific. TANC alleges that Sierra Pacific committed the state law tort of intentional misrepresentation because Sierra Pacific:

[O]btained governmental permits and authorizations to construct and operate the Alturas Intertie Project by representing to governmental agencies and interested parties, including plaintiff,

that the purpose of the Alturas Intertie Project was to provide emergency support to Sierra Pacific and to enable Sierra Pacific to make occasional economy purchases and sales, but not to purchase power to increase capacity.

TANC does not specify in its complaint whether the alleged misrepresentations were made to FERC, the California Public Utilities Commission (PUC), or both. However, in its brief, TANC explains that "it believes the evidence is irrefutable that Sierra Pacific misrepresented its intentions regarding its use of the Alturas Intertie Project to the California Public Utilities Commission, and to those participants in the commission's proceedings." We therefore construe this claim as alleging misrepresentations in proceedings before the PUC.[10]

If the alleged misrepresentations were made before the California PUC, then the predicate bad act occurred before a state agency, and federal law appears, at first glance, irrelevant. Yet, the problem with TANC's fraud claim remains the same as it is for its contract-related claims: TANC cannot prove damages without assuming that FERC would have allocated 4800 MW to the California–Oregon Intertie. Even assuming, without deciding, that the California PUC could have blocked construction of the Alturas Intertie, TANC's alleged "right" to 4800 MW, from which TANC derives its damages, violates the filed rate doctrine's prohibition on assuming hypothetical allocations of interstate transmission capacity.

**10.** If TANC's fraud claim were predicated on alleged misrepresentations before FERC, it would still be preempted based upon the reasoning that we apply infra to a claim alleging misrepresentations to the California PUC. We note that such a claim might also be preempted under *Buckman v. Plaintiffs' Legal Commission,* 531 U.S. 341, 343–44, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (holding that a state law fraud-on-the-Food and Drug Admin-

istration (FDA) claim is impliedly preempted by statutory scheme granting FDA power to punish and deter fraud), and *Nathan Kimmel, Inc. v. DowElanco,* 275 F.3d 1199, 1204–07 (9th Cir.2002) (holding that a state law claim that hinged upon the theory that the defendant made misrepresentations to the Environmental Protection Agency was preempted by a statutory scheme similar to that at issue in Buckman), but we need not decide that issue.

We recognize that the Supreme Court has yet to resolve the issue of whether a claim based upon fraud before an agency can be preempted by the filed rate doctrine. *See Arkansas Louisiana Gas Co.,* 453 U.S. at 583 n. 13, 101 S.Ct. 2925. However, two circuits have concluded that filed rate preemption applies even where the claim is that a rate was procured by fraud. In a case where the fraud allegedly involved the state agency that approved the rate, the Eight Circuit held: "[T]he underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 489 (8th Cir.1992). Because in that case the plaintiffs' fraud claim required that damages be measured by comparing the rates actually approved with those that allegedly should have been approved absent fraud, the court held that the filed rate doctrine barred the fraud claim. *Id.* at 488–92. Similarly, sitting en banc, the Eleventh Circuit in *Taffet v. Southern Co.,* 967 F.2d 1483, 1494–95 (11th Cir.1992), held that an allegation that a filed rate was procured by fraud did not preclude application of the filed rate doctrine. We find these cases persuasive.

The impact of any award of damages to TANC for Sierra Pacific's alleged misrepresentation would be to undermine FERC's ability to regulate rates through its open access transmission policy. Such an award of damages would necessarily assume that, but for Sierra Pacific's alleged fraud, FERC would have made a specific allocation of electricity to TANC. *Cf. H.J., Inc.,* 954 F.2d at 489.

■ We conclude that TANC's fraud claim is preempted by the filed rate doctrine. We do not suggest, however, that in every case where FERC and a state utility commission have both approved a defendant's electricity intertie, a plaintiff could not possibly demonstrate damages from fraud committed before the state utility commission without implicating the filed rate doctrine.[11] Here, however, TANC has failed to present a model of damages that does not impermissibly rely upon an assumption that FERC would have continued to allocate a certain amount of electricity transmission capacity to the California Oregon Intertie but for Sierra Pacific's misrepresentations.

## IV

## Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

**11.** We note that the California law does not recognize a state law equivalent of the filed rate doctrine. See *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 992–93 (9th Cir.2000) (citing *Cellular Plus, Inc., v.Super. Ct.,* 14 Cal.App.4th 1224, 18 Cal.Rptr.2d 308 (1993)). Our decision, thus, is entirely based upon the effect of an award of damages on FERC's authority over interstate rates.